### NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

### LOVEJOY INDUSTRIES, INCORPORATED, Respondent.

No. 89–1074.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 7, 1989.

Decided June 14, 1990.

Aileen A. Armstrong, Leizer Goldsmith, N.L.R.B., Appellate Court—Enforcement Litigation, Charles P. Donnelly, Jr., N.L.R.B., Washington, D.C., Harvey A. Roth, N.L.R.B., Chicago, Ill., for petitioner.

Larry G. Hall, Matkov, Salzman, Madoff & Gunn, Chicago, Ill., for respondent.

Before WOOD, Jr., COFFEY, and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

During October 1987 the NLRB conducted an election among production and maintenance employees of a factory at which the Acme Die Casting division of Lovejoy Industries manufactures zinc and aluminum die castings. The union won by a vote of 69 to 39. The employer lodged objections to the union's conduct before the election. After its regional director investigated these and concluded that a hearing was unnecessary, the Board certified the union as the representative of the labor force. Lovejoy refused to bargain with the union; the Board held that the refusal is an unfair labor practice and directed Lovejoy to bargain. The Board asks us to enforce this order. Lovejoy's principal defense is based on 29 C.F.R. § 102.69(d), which states that a hearing "shall be conducted with respect to those objections or challenges which the *regional director* concludes raise substantial and material factual issues."

Lovejoy's objections to the election fall into four categories: threats by union adherents, vandalism the firm attributes to the union, marking of sample ballots, and a request for concessions. The latter two are of little consequence.

A few days before the vote, the company posted an official notice of election, including a sample ballot. Someone quickly put a blue "X" in the "yes" box. The company replaced it with a fresh notice; it was marked in the same fashion within hours and promptly removed. The third time was the charm, for the next notice went unmarked through the election. As the regional director concluded, such transient (and transparent) conduct had no substantial ability to affect the election. *Bank of India v. NLRB*, 808 F.2d 526, 540–41 (7th Cir.1986).

The union's request for benefits followed an assembly at which the employer's president told employees that the firm would not dismiss anyone for supporting the union. The next morning several of the union's adherents asked the president to sign a statement "that if the [union] loses the election … there will not be any layoffs at Acme Die Casting". He refused, on the ground that such a pledge not only would enlarge the promise not to penalize people for supporting the union but also

would run afoul of the rule that during a campaign employers may not extend benefits out of the regular course. A no-layoff pledge, most unusual for a manufacturing plant facing cyclical demand, would have gotten the firm in hot water. *NLRB v. Exchange Parts Co.*, 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964). We may assume that the employees' demand was calculated to give the union a talking point: the firm vowed not to use retaliatory layoffs, but it would not put a no-layoff pledge in writing and so was two-faced. Still, employees heard what the president said and could judge for themselves the significance of the refusal to sign the union's broader language; the firm was free to say why it balked. The Board no longer gives close scrutiny to the electioneering tactics of either side. *Midland National Life Insurance Co.*, 263 N.L.R.B. 127 (1982). Petty wrangles of this kind do not justify undoing the outcome of an election.

Lovejoy's first two objections are more substantial. For convenience we shall treat them together. Because the regional director did not hold a hearing, we have only the employer's version of events. Even this may be incomplete, for Lovejoy asserts that some employees, frightened by what happened during the campaign, feared retaliation and so would not furnish statements for public consumption. At a hearing Lovejoy would have had access to compulsory process, and its inability to compel the employees to speak is at the core of its objections to the Board's procedures.

According to employee Alfred McCann, Sacramento Olivaros learned that McCann did not support the union and told McCann that he had better "watch out" and "look out". A few days later, someone scratched the side of McCann's car, parked in the company's lot. McCann also related that "[s]hortly before the election Miguel [Aguilar] told me that the radiator in his car had been punched in at least three times while the car was parked in the Acme parking lot." Aguilar refused to give the company a sworn statement confirming McCann's story or revealing the circumstances that led Aguilar to link the damage to the union.

Lovejoy finds these two episodes of vandalism especially significant because (a) neither before nor since the organizing campaign has a car been damaged in its lot, and (b) McCann says that he informed other employees what happened.

An unidentified union supporter called employee Florentino Olivares a "chicken" for refusing to sign a card authorizing the union to represent him. Olivares states that he signed a card to stop the name-calling. James Scott, one of the firm's supervisors, told the regional director that employee Francesco Mombela told Scott that Mombela had signed an authorization card "out of fear of damage to his property and injury to his family". Scott did not recount what, if anything, gave Mombela cause for fear. Scott said that Mombela would not give the company an affidavit to present to the Board because he feared the union and that Olivares, who did supply an affidavit, expressed concern that union men would "take action against him" if they found out he had helped the company.

After Lovejoy presented this evidence, the regional director interviewed some of its employees off the record. The regional director concluded that there had been no threats of violence and that the name-calling and implied threats of ostracism were "isolated and not coercive". Olivaros's language was "vague", and in the regional director's view the absence of "overt threats", when coupled with the sporadic property damage, was not enough to call the election into question—at least when neither the veiled threats nor the vandalism could be linked directly to the union. The regional director recommended that the Board certify the union as the victor, which it did. The unfair labor practice case was perfunctory and serves only to allow judicial review of the decision to accept the results of the election.

If the regional director thought he could resolve disputes and draw inferences on the basis of ex parte interviews with a few of Lovejoy's employees, without offering the employer either a hearing or compulsory process to obtain evidence, he was mistaken. Section 102.69(d) requires the re-

gional director to hold a hearing when there are "substantial and material factual issues". Although the interpretation of these words has produced disagreement both within and without this circuit, our most recent assessment is that the regional director must hold a hearing when the employer presents facts "sufficient to support a prima facie showing of objectionable conduct", that is, of "misconduct sufficient to set aside the election under the substantive law of representation elections". *NLRB v. Service American Corp.*, 841 F.2d 191, 195 (7th Cir.1988). This is functionally the approach a district court uses when evaluating a motion for summary judgment. Accord, *Scintilla Power Corp. v. NLRB*, 707 F.2d 419, 421 (9th Cir.1983) (Kennedy, J.). Although at least the First and Third Circuits give the regional director more leeway, *NLRB v. Newly Weds Foods, Inc.*, 758 F.2d 4, 12 (1st Cir.1985) (Breyer, J.); *NLRB v. ARA Services, Inc.*, 717 F.2d 57, 63–69 (3rd Cir.1983) (en banc), the parties have not asked us to revisit the subject.

Although the regional director is supposed to use the summary judgment standard, courts review the Board's decisions—including its decisions not to hold hearings—deferentially. *Van Leer Containers, Inc. v. NLRB*, 841 F.2d 779, 784 (7th Cir. 1988); *NLRB v. Chicago Marine Containers, Inc.*, 745 F.2d 493, 496 n. 2 (7th Cir. 1984). At first this seems inconsistent. What is the point of deference when the existence of a prima facie case is a question of law? Courts of appeals review de novo decisions by district judges granting or denying summary judgment. If the regional director plays the role of the district judge, why does not the court of appeals play its traditional role in reviewing such decisions and deciding whether a hearing should be held? Four judges, dissenting in *ARA Services*, 717 F.2d at 72–78 (Garth, J., joined by Hunter, Weis & Becker, JJ.), argued that equivalence in the factfinders' roles implies equivalent appellate review.

Equivalence between regional director and district judge breaks down because in labor law the court of appeals is neither the first tier of review nor the author of the rules of decision. The Board rather than the court reviews the regional director's performance. Disappointed parties do not "appeal" the Board's decision to the court; they obtain review under 29 U.S.C. §§ 160(e) and (f), which direct courts to accept those findings supported by "substantial evidence". The statutory language applies not to findings of fact alone (which do not exist until after a hearing) but to "the findings of the Board with respect to questions of fact". If the Board holds hearings and makes findings in election contests, the "substantial evidence" test applies. *Mosey Manufacturing Co. v. NLRB*, 701 F.2d 610, 614–15 (7th Cir.1983) (en banc). When deciding that a hearing is unnecessary, the Board also makes a "finding ... with respect to questions of fact"; judicial review is accordingly still deferential. There may be "substantial" evidence behind the regional director's action even though a court with the power of de novo review would have found the decision wanting. See *Chicago Marine*.

Substance rather than semantics drives this conclusion. Section 102.69(d) is not so much a rule giving entitlements to the parties as it is a device for the Board to control its staff. Members of the Board must delegate investigation and fact-finding tasks to subordinates, and with delegated power come standards of action. Policing intra-agency procedure—whether the regional director did what he was supposed to—is for the owners of the delegated power (the Members of the Board) rather than the courts. More than that, § 102.69(d) requires the regional director to hold a hearing when the factual disputes are material. "Material" means relevant and potentially dispositive under the prevailing legal standards. District judges do not make up the rules of law as they go along; for much of its work, the Board does craft the rules of law it applies, exercising discretion in adjusting the entitlements of workers, unions, and employers. *NLRB v. Curtin Matheson Scientific, Inc.*, —— U.S. ——, 110 S.Ct. 1542, 1549, 108 L.Ed.2d 801 (1990); *NLRB v. Bufco Corp.*, 899 F.2d 608, 610–11 (7th Cir.1990); *Communication Workers v. NLRB*, 784 F.2d 847, 849

(7th Cir.1986). The holder of a power to determine substance has leeway to shape the rules of procedure best suited to carry it out. *FCC v. Schreiber*, 381 U.S. 279, 290, 85 S.Ct. 1459, 1467, 14 L.Ed.2d 383 (1965); *Jones v. Illinois Central Gulf R.R.*, 846 F.2d 1099 (7th Cir.1988); *Communication Workers*, 784 F.2d at 852–53.

Nowhere is the Board's ongoing revision of substance more apparent than in its handling of questions concerning representation. For much of its history the Board was of opinion that employees are so timorous that only "laboratory conditions" allow them to exercise free choice. *Hollywood Ceramics Co.*, 140 N.L.R.B. 221 (1962); *Gummed Products Co.*, 112 N.L.R.B. 1092 (1955). The NLRB had an (implicit) picture of an employee informed and bold enough to sign an authorization card declaring his support of the union, but so readily befuddled by propaganda or tough talk that even in the secrecy of the voting booth he would be too baffled or scared to vote freely. Scholars doubted that the Board's picture of employees' process of decision comported with reality, and the most thorough study led its authors to conclude that (a) electioneering does not have much effect (most employees' minds are made up before the campaign); (b) unfair labor practices during the campaign, far from causing the employees to vote against the union, cause them to appreciate that they *need* a union, and consequently improve the union's chance of winning in a secret ballot. Julius G. Getman, Stephen B. Goldberg & Jeanne B. Herman, *Union Representation Elections: Law and Reality* (1976). These conclusions have led to debate; compare the articles questioning the methodology in 28 Stan.L.Rev. 1161–1207 (1976) with the authors' defense, Stephen B. Goldberg, Julius G. Getman & Jeanne M. Brett, *Union Representation Elections: Law and Reality: The Authors Respond to the Critics*, 79 Mich.L.Rev. 564 (1981). See also Judith A. Lachman, *Freedom of Speech in Union Representation Elections: Employer Campaigning and Employee Response*, 1982 Am. Bar Found. Res. J. 755. In *Shopping Kart Food Market, Inc.*, 228 N.L.R.B. 1311 (1977), the Board, citing this research, threw over its old "laboratory conditions" doctrine and adopted a view that only fraud or serious unfair labor practices spoil a vote. *Shopping Kart* was overruled in *General Knit of California, Inc.*, 239 N.L.R.B. 619 (1978), which was overruled in turn by *Midland National Life Insurance.* Prevailing doctrine has it that employees are hardy, so that the results of elections usually stand despite imperfections that would have led to re-runs or bargaining orders in earlier years. Other doctrines affecting representation are in evolution too. *Curtin Matheson* describes the latest turn in the Board's view of inferences to be drawn from the fact that some employees in a unit are strike-breakers.

*Midland* left in place the Board's view that coercion and violence during a campaign deprive the employees of the free choice that the statute requires. See *Home & Industrial Disposal Service*, 266 N.L.R.B. 100 (1983). On this question, too, the Board's collective mind has changed from time to time. As recently as 1978 the Board held that a threat of reprisal against employees who did not cooperate with the union would not justify setting aside an election, unless the threats dealt with the election itself. *Hickory Springs Manufacturing Co.*, 239 N.L.R.B. 641 (1978), overruled by *Home & Industrial Disposal Service.* Misinformation during a campaign goes with an employee into the voting booth and may yield a vote that the employee would not cast if accurately informed; threats may get the employees' dander up, leading to retaliation in private by casting a ballot against the tormenter. So it would not be irrational for the Board to think that arm-twisting does not automatically spoil an election.

Although the Board regularly requires re-runs on the basis of threatened or actual violence, it just as regularly refrains from calibrating how much is too much. Subtle changes in Members' assumptions about how hardy employees' constitutions are, whether threats by union adherents are as bad as threats by the union itself (that is, by people holding office or running the campaign), and whether employees recog-

nize that in the privacy of the voting booth they may repay the bullies with ballots, will lead to subtle changes in the Board's application of nominally constant rules. A jurisprudence of "I know it when I see it"—which approximates if it does not wholly capture the Board's approach to how much coercion spoils an election—is not one in which the courts may define "a" prima facie case and insist that the Board hold hearings accordingly. The Board may not change standards so much from case to case that no one can figure out its approach; agencies also may not contradict themselves without giving reasons for the new course. *Mosey*, 701 F.2d at 615. Yet some case-to-case wobble is normal in common law adjudication under standards such as "fairness", and because the Board is free to adopt a plastic standard rather than a bright line rule, the judicial role is correspondingly small.

■ Because the Board is tailoring the rules as part of the process of application, a decision not to hold a hearing when confronted with certain evidence amounts to a decision that this evidence is not a prima facie case of *enough* misconduct to set aside an election. That is the sort of decision the Board was established to make, and to which the courts must defer. Additional hearings mean additional delay. Congress insulated from judicial review the decision to certify a union as bargaining representative precisely because it was concerned about the baleful effects of delay. *Mosey*, 701 F.2d at 614; *ARA Services*, 717 F.2d at 63. During delay, the entitlements of the employees to representation by the union they elected are frustrated. Uncertainty about the outcome may breed tension. We therefore adhere to the holding of *Van Leer Containers* that the Board's decision not to hold a hearing in a contested representation matter is reviewed deferentially.

■ Substantial evidence supports the Board's order. The two episodes of vandalism are the most serious events, yet neither could be connected to the union. Alfred McCann does not know who damaged his car; although he suspects Olivaros, there is no evidence that Olivaros was one of the union's organizers as opposed to a supporter. The Board may rationally conclude that employees' votes are less likely to be swayed by the isolated bluster and misconduct of adherents than by a policy of intimidation carried out by the union itself. *Service American Corp.*, 841 F.2d at 195; *Tuf–Flex Glass v. NLRB*, 715 F.2d 291, 296 (7th Cir.1983). Of such a policy directed by the union there is no evidence at all, and no basis for an inference. Two incidents of petty vandalism in a labor force exceeding 100 does not suggest a policy, especially not when there is no substantial reason to link the damage to Miguel Aguilar's car to the campaign.

What remain are bullying words: union supporters telling fellow employees to "look out" and asking whether they are "chicken". Tough talk may have been the norm at Acme Die Casting with or without a campaign; none of the talk was attributed to the union's organizers or occurred in the month immediately preceding the election. The statute does not require the Board to treat employees as if they were bacteria on a petri dish that must be kept free of contamination. Employees' apprehension is not itself sufficient to spoil the vote. *Chicago Marine*, 745 F.2d at 500. Professions of fear from employees who do not or cannot explain its basis do not oblige the Board to conduct a hearing.

The larger the bargaining unit, the more likely some of the union's adherents will overstep the bounds of propriety, and the more likely some of the union's opponents will consider themselves (rightly or wrongly) at risk. More than 110 employees were in the unit certified at Acme Die Casting, creating a significant risk that something would go wrong even if almost everyone was on tippie-toes almost all the time. The Board may decide to disregard incidents few in number in relation to the size of the unit—especially when, as here, the election is lopsided. Vague apprehension describes the situation, so far as the record discloses. Whether or not we would have entertained doubts about this election, the Board was

not required to inquire at greater length than it did, and its order is

ENFORCED.