NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

LAKE HOLIDAY ASSOCIATES, IN-
CORPORATED, doing business as
Lake Holiday Manor, Respondent.

No. 90–1642.

United States Court of Appeals,
Seventh Circuit.

Submitted * Jan. 25, 1991.

Decided April 23, 1991.

* Submitted to the panel on the briefs and record only without oral argument.

Judith A. Dowd, Paul Hitterman, Paul Hitterman, N.L.R.B., Aileen A. Armstrong, Howard E. Perlstein, Nancy B. Hunt, N.L.R.B., Appellate Court, Enforcement Litigation, Washington, D.C., William T. Little, N.L.R.B., Indianapolis, Ind., for petitioner.

John L. Egloff, Donald S. Smith, Michael P. Dugan, Riley, Bennett & Egloff, Indianapolis, Ind., for respondent.

Before MANION and KANNE, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

MANION, Circuit Judge.

The National Labor Relations Board (the Board) petitions for enforcement of its order finding that Lake Holiday Associates violated §§ 8(a)(5) and (1) of the National Labor Relations Act (the Act) by refusing to furnish information to and bargain with the elected bargaining representative of its employees at Lake Holiday Manor nursing home. For the following reasons, we grant the Board's petition and order enforcement.

I.

Lake Holiday Associates operates Lake Holiday Manor, a nursing home in De-

Motte, Indiana. After several weeks of organizing activity, culminating in an employee demand for union recognition on October 17, 1986, 1199 Indiana, National Union of Hospital and Health Care Employees (the Union) filed a petition with the Board seeking recognition as bargaining representative on October 20, 1986. The Union originally filed two petitions. One sought a representation election among a bargaining unit consisting of Lake Holiday's service and maintenance employees. A second petition sought an election among a bargaining unit consisting of Lake Holiday's licensed practical nurses (LPNs). The Union withdrew the second petition, however, after Lake Holiday asserted that the LPNs were supervisors who are not protected by the Act. See *N.L.R.B. v. Res–Care, Inc.,* 705 F.2d 1461, 1465 (7th Cir. 1983).

The Board conducted a secret ballot election among the service and maintenance employees on December 3, 1986. The election tally showed 39 votes in favor of and 13 votes against union representation. There were also. one void ballot and five challenged ballots. Even counting all the challenged and void ballots against the Union, the Union resoundingly won the election by a count of 39–19, a twenty-vote (or approximately 33%) margin.

Lake Holiday filed timely objections to the election. Its first objection alleged that two of its supervisors, Jennifer Nicholas and Elaine McElroy, actively supported the Union and thus tainted the election. Other objections alleged that damage to employee property, threats of job loss, and unwarranted investigations by the Indiana Board of Health (apparently instigated by the Union or its supporters) created an atmosphere of coercion that rendered the election invalid.

After conducting an investigation and considering Lake Holiday's evidentiary support for its charges, the Board's Regional Director recommended overruling all of Lake Holiday's objections and certifying the Union as bargaining representative. On appeal, the Board adopted all of the Regional Director's recommendations ex-

cept for his recommendation concerning the "supervisory taint" issue. Concerning that issue, the Board ordered an evidentiary hearing. Pursuant to the Board's order, a Hearing Officer conducted a hearing and issued a report recommending that Lake Holiday's objection be overruled. The Hearing Officer concluded that neither Nicholas nor McElroy were supervisors as § 2(11) of the Act, 29 U.S.C. § 152(11) defines the term. He concluded further that even if Nicholas and McElroy were supervisors, their conduct did not justify overturning the election. On appeal, the Board adopted the Hearing Officer's conclusion that neither Nicholas' nor McElroy's conduct warranted overturning the election. The Board thus found it unnecessary to decide whether or not Nicholas and McElroy were actually supervisors. Based on its finding, the Board certified the Union as the collective bargaining representative for Lake Holiday's service and maintenance workers.

Since the Act generally does not allow judicial review of the Board's decision to certify a representation election, see *Boire v. Greyhound Corp.,* 376 U.S. 473, 476–77, 84 S.Ct. 894, 896–97, 11 L.Ed.2d 849 (1964); *Chicago Truck Drivers v. N.L.R.B.,* 599 F.2d 816, 817–18 (7th Cir.1979), Lake Holiday did not seek review of the Board's decision. Instead, when the Union sought bargaining information from Lake Holiday, and demanded that Lake Holiday bargain with it, Lake Holiday refused. The Union filed an unfair labor practice charge against Lake Holiday. The Board, finding that Lake Holiday (by its own admission) had refused to supply information or to bargain, and that Lake Holiday had or could have raised all representation issues in the representation proceeding, found that Lake Holiday had committed unfair labor practices, granted the General Counsel's motion for summary judgment, and ordered Lake Holiday to remedy its violations. The Board petitioned this court seeking enforcement of its order; that petition also brings before us the Board's decision to certify the Union. See 29 U.S.C. § 159(d); *Boire,* 376 U.S. at 476–77, 84 S.Ct. at 896–97; *N.L.R.B. v. Service Amer-*

*ican Corp.*, 841 F.2d 191, 193 & n. 3 (7th Cir.1988).

## II.

In this court, Lake Holiday first argues that the Board should have set aside the election because Nicholas' and McElroy's activities on behalf of the Union tainted the election. Lake Holiday disputes the Hearing Officer's finding that Nicholas and McElroy were not supervisors. However, we need not concern ourselves with this question, since the Board found that even if Nicholas and McElroy were supervisors, their activities did not warrant overturning the election. As did the Board, we will assume for purposes of this argument that Nicholas and McElroy were supervisors.

 A supervisor's support for a union during a representation campaign does not necessarily invalidate the representation election. *N.L.R.B. v. Cal–Western Transport*, 870 F.2d 1481, 1484 (9th Cir. 1989). A supervisor's pro-union conduct is grounds for setting aside an election only if the challenging party demonstrates either that the conduct led the employees to believe that the employer favored the union or if the conduct reasonably tended to coerce employees into supporting the union because they feared future retaliation. *Id.;* see also *N.L.R.B. v. Browning–Ferris Industries of Louisville*, 803 F.2d 345, 348–49 (7th Cir.1986). We review deferentially the Board's decision that a supervisor's pro-union conduct was insufficient to invalidate an election, overturning that decision only if there is not substantial evidence to support the Board's decision. See *Browning–Ferris*, 803 F.2d at 347; *Cal–Western Transport*, 870 F.2d at 1483–84.

 Lake Holiday concedes that there was no threat that Nicholas' and McElroy's pro-union activity misled employees into thinking the nursing home's management favored the Union. The evidence supports this concession. The home's highest-ranking official, Dorothy Huston, sent three letters to employees setting out management's unequivocal opposition to the Union, and the employee-witnesses consistently testified that they knew management op-posed the Union. Thus, we need only examine whether substantial evidence supported the conclusion that McElroy's and Nicholas' actions were not unduly coercive.

Nicholas was a charge nurse (that is, an LPN) on the home's 3:00 p.m. to 11:00 p.m. shift. The Hearing Officer found that Nicholas attended two union meetings, at which she discussed whether the Union could represent the LPNs. She also signed a Union authorization card.

McElroy served as a charge nurse for two days each week, and as the home's Assistant Director of Nursing (ADON) for three days each week, until October 20, 1986. On that day, the home's then-Director of Nursing (DON) quit, and McElroy became the Acting DON until November 13, when Lake Holiday hired a new DON. On that date, McElroy resumed her prior positions as ADON and charge nurse.

The Hearing Officer found that McElroy engaged in several acts showing support for the Union. On one occasion, McElroy told employee Carol Croft that she wished "the Union would get in this place." On another occasion, McElroy beckoned employee Patty Wilson into the shower room and told her she should vote for the Union because the Union would make things better for the employees and improve conditions in the nursing home. Finally, early in the organizing campaign, McElroy told Virginia Gunter, an employee interested in seeking representation, that McElroy could obtain a list of phone numbers for union supporters to call.

Even assuming that Nicholas and McElroy were supervisors, and had the authority to punish or reward employees for supporting or not supporting the Union, it was reasonable for the Board to conclude from the evidence before it that the pro-union activity the Hearing Officer found Nicholas and McElroy engaged in did not carry a sufficient threat of coercion to justify setting aside the election. The evidence supports a finding that Nicholas' and McElroy's ability to effectively punish or reward employees for supporting or not supporting the Union (for example, by firing them,

recommending adverse job actions, or assigning employees more or better hours) was limited. Huston herself testified that although she gave "good weight" to a charge nurse's recommendation, the normal course she followed when acting on a recommendation by a charge nurse to· fire an employee was to "listen to ... and read the recommendations and investigate[]...." Moreover, Huston also testified that management did not want charge nurses to "persecute" employees; any employee who believed he or she was being treated unfairly could complain to Huston, who would investigate the matter and set aside any action by the charge nurse if necessary. Given this along with management's unequivocal (and known) opposition to the Union, it was reasonable to conclude that charge nurses would not be able to punish or reward employees for supporting or not supporting the Union.

Besides Nicholas' and McElroy's limited ability to reward or punish, there is no evidence that either Nicholas or McElroy ever threatened to take any adverse action against any employee who did not support the Union, or ever promised to reward any employee who supported the Union. Nor is there any evidence that any employee feared retaliation. Cf. *Fall River Savings Bank v. N.L.R.B.*, 649 F.2d 50, 57 (1st Cir.1981). Furthermore, the time frame of the acts Lake Holiday complains about makes it more than likely that those acts had little potential to coerce employees. Both union meetings Nicholas attended occurred early in the organizing campaign, before the employees had even demanded recognition. McElroy's statement to Gunter about being able to obtain phone numbers also occurred early in the campaign. Lake Holiday's evidence concerning when the other two incidents involving McElroy occurred is sketchy. (Indeed, the Hearing Officer, while crediting Wilson's testimony about the shower room conversation, refused to consider it because Wilson could not say when it occurred.) From the record, however, it is reasonable to conclude both these incidents occurred early in the campaign, before the Union filed its election petition.

The fact these incidents occurred early in the organizing campaign is significant. At that time, the charge nurses were attempting to obtain union recognition for themselves. Thus, it is likely that employees would have considered Nicholas' and McElroy's actions more as the personal action of peers rather than as coercion by supervisors. The fact that Nicholas' and ·McElroy's pro-union activity stopped at about the same time the Union decided not to pursue representation for the charge nurses reinforces this conclusion. When Nicholas and McElroy had no more to gain from supporting the Union, their support ended.

Lake Holiday complains that Nicholas and McElroy engaged in more pro-union activity than the Hearing Officer found. According to Lake Holiday, Nicholas took Croft into her office one day and solicited Croft's signature on a union card. This is based on Croft's testimony, which the Hearing Officer discredited. Lake Holiday challenges this credibility determination. We will not reverse a Hearing Officer's credibility determination "absent the most extraordinary circumstances such as utter disregard for sworn testimony or the acceptance of testimony which is on its face incredible." *Tuf–Flex Glass v. N.L.R.B.*, 715 F.2d 291, 295 (7th Cir.1983). Such circumstances are not present here. Lake Holiday complains that the Hearing Officer unreasonably refused to credit Croft's testimony because Croft knew Lake Holiday sought her testimony to prevent Union representation, a factor Lake Holiday says the Hearing Officer inconsistently failed to apply to other witnesses. Even if this is true, Lake Holiday ignores the three other reasons the Hearing Officer gave for rejecting Croft's testimony. First, the Hearing Officer noted that Croft's testimony was uncorroborated, even though three other employees (including the then-Director of Nursing, Sally Kremke, a manager) were allegedly at the meeting. Second, the Hearing Officer found Croft's testimony rather strange, in that Croft's testimony would require belief that Kremke, a manager, said or did nothing about it despite management's unequivocal opposition to the Union. Finally,

the Hearing Officer was reluctant to credit Croft's testimony because of her "guarded and defensive demeanor." Our review of the record reveals no reason to question these observations or to overturn the Hearing Officer's decision not to credit Croft's testimony.

Lake Holiday also complains about the Hearing Officer's refusal to credit testimony by employee Nancy Sayers. Sayers testified that one day in October, 1986, as she was walking down the hall, McElroy, who was walking the opposite way, said out of the blue as she passed that, "I'm recruiting for the Union." The Hearing Officer refused to credit this testimony because when Sayers first gave this statement to the Board, she said that McElroy had said, "I'm recruiting for the girls." The Hearing Officer also found Sayers to be "an honest but confused witness," and found her testimony on McElroy's statement to be unreliable.

One might consider the Hearing Officer's refusal to credit Sayers' testimony to be nit-picking; after all, there is little difference between Sayers' two statements, and interpreting "the girls" to mean "the Union" is not unreasonable. Still, the statements were different, which evidences at least some confusion on Sayers' part. Moreover, the whole incident as Sayers relates it was somewhat strange, with McElroy making her statement for no apparent reason, and without following it up. The Hearing Officer had the opportunity to observe Sayers personally, and thus has a better feel for whether or not she was confused than this court could have. We do not find the extraordinary circumstances necessary for us to overturn the Hearing Officer's decision not to credit Sayers' testimony.

Lake Holiday also points to evidence of several other incidents, reported by Gunter, that the Hearing Officer failed to mention in his report. Gunter testified that on October 17, McElroy gave the "thumbs up" signal (apparently, a sign of support) to a group of employees headed to Huston's office to demand recognition. Gunter also testified that early in the campaign (before

the employees demanded recognition) McElroy had told her and several other employees to "all join up." Finally, Gunter testified that somebody had told her that McElroy stated that she wanted to be present when the employees demanded recognition so she would see Huston's reaction.

There is no evidence that any of these incidents involved any threats or coercion. Moreover, all these incidents occurred very early in the campaign, when McElroy was still pursuing union representation for the charge nurses. As we have noted, the timing of these incidents significantly reduces any threat that the employees would interpret McElroy's actions as supervisor coercion. The most likely reason the Hearing Officer failed to note these incidents is because he concluded they were inconsequential. Even if believed (and we see no reason why the Hearing Officer necessarily had to credit Gunter's hearsay testimony about McElroy's wish to be present in Huston's office when the employees demanded recognition), these incidents do not change our conclusion that the Board reasonably decided that Nicholas' and McElroy's pro-union activity did not present a sufficient threat of coercion to justify over-turning the election.

### III.

Besides complaining about Nicholas' and McElroy's pro-union conduct, Lake Holiday also filed objections seeking to set aside the election because of vandalism to employees' property, unwarranted investigations by the Indiana Board of Health, and threats of job loss if the Union lost the election. The Regional Director investigated these complaints and recommended that the objections based on them be denied without a hearing. The Board adopted the Regional Director's recommendation and denied Lake Holiday's objections without a hearing.

■ Lake Holiday argues that the Board erred by not holding a hearing. While the Board may not resolve factual disputes and draw inferences without offering the objecting party either a hearing or compulso-

ry process to obtain evidence, the Regional Director must hold a hearing only when "substantial and material factual issues" exist. *N.L.R.B. v. Lovejoy Industries, Inc.*, 904 F.2d 397, 399–400 (7th Cir.1990). This means the Regional Director must hold a hearing "when the employer presents facts 'sufficient to support a prima facie showing of objectionable conduct,' that is, of 'misconduct sufficient to set aside the election under the substantive law of representation elections.'" *Id.* at 400 (quoting *N.L.R.B. v. Service American Corp.*, 841 F.2d 191, 195 (7th Cir.1988)).

■ As we explained in *Lovejoy*, in determining whether a hearing is necessary in any particular case, the Board essentially must decide whether the employer has proffered evidence of enough misconduct to set aside an election. A decision about how much misconduct is enough to set aside an election is "the sort of decision the Board was established to make, and to which the courts must defer." *Lovejoy*, 904 F.2d at 402. Consequently, we review the Board's decision not to hold a hearing only to determine whether substantial evidence supports that decision. *Id.* at 400, 402.

Lake Holiday submitted evidence of several acts of vandalism. Employee Bob Clark, who opposed the Union, found the tires on his truck punctured. Clark also reported that on November 28 he found glass beneath the wheels of Huston's car. Clark did not know who punctured his tires or put the glass beneath Huston's tires. He also stated that he had never told anybody he was against the Union, and believed no employees knew he was against the Union. An unnamed employee stated that on November 25 she found that somebody (who, she did not know) had let the air out of her tires. This unnamed employee supported the Union. Another unnamed employee stated that during early November somebody cut her automobile's radiator hose, and that at some other time during the union campaign somebody had beaten the rim of one of her tires while she was at work. Finally, another unnamed employee stated that someone had let the air out of her car's tires and loosened the lug nuts while she was at work.

Lake Holiday also presented evidence concerning two alleged "threats." One employee stated, "The girls said to me, [if the Union] does not get in, [Lake Holiday] will get rid of employees sympathetic to the Union. This was just general conversation." She also stated that after the election, another employee told her that if the Union did not win, the home would be shut down "by the end of the year."

Finally, Lake Holiday presented evidence, in an affidavit by Huston, about "numerous unwarranted complaints" somebody had made to the Indiana State Board of Health between May and December of 1986. Huston stated that five inspections resulted from the complaints. Although Huston did not know who made the complaints, the nature of the complaints (for example, "not enough food" and "not enough diapers") led her to believe that someone on the inside, such as an employee or former employee, was making the complaints.

■ The Board acted well within its discretion in refusing to hold a hearing on Lake Holiday's objections. The charges of vandalism were the most serious. Yet, there was no evidence to connect any of these acts to the Union, nor is it reasonable to infer from Lake Holiday's proffered evidence that the Union or Union supporters were engaged in an intimidation campaign. Nobody knew Clark was against the Union, and even a Union supporter's car was vandalized. The Board could reasonably conclude from all this that the vandalism was not part of a Union campaign to coerce, and was not likely to coerce, employees into voting for the Union.

■ The Board could also reasonably conclude that the "threats" of job loss were innocuous. The "general conversation" that Lake Holiday would fire Union supporters cannot be attributed to the Union, and speculation by employees about things they cannot control is not the type of statement that would likely cause workers to vote for the Union out of fear. In any event, there was no evidence that any em-

ployee actually believed this "threat." The other "threat" occurred *after* the election; Lake Holiday does not explain how a statement made after the election could have affected the employees' votes.

■ Finally, it was reasonable to conclude the unwarranted complaints to the Board of Health did not require setting aside the election. Again, nothing but Huston's speculation connects this to the Union or Union supporters. More importantly, Lake Holiday does not even try to explain how the complaints and resulting inspections could have coerced the employees into voting for the Union.

■ Lake Holiday complains that the Regional Director failed to consider the "totality of circumstances" (including McElroy's and Nicholas' pro-union activity), improperly focusing on each objection in isolation. However, an argument based on the cumulative impact of several incidents " 'may not be used to turn a number of insubstantial objections to an election into a serious challenge.' " *N.L.R.B. v. Browning–Ferris Industries*, 803 F.2d at 349 (quoting *Amalgamated Clothing & Textile Workers v. N.L.R.B.*, 736 F.2d 1559, 1569 (D.C.Cir.1984)). As we have seen, none of the conduct Lake Holiday complains of was sufficient to overturn the election. Moreover, Lake Holiday has not established a coercive pattern of conduct, see *Browning–Ferris*, 803 F.2d at 349–50; most of the conduct was innocuous, or has not been connected to the Union. Moreover, there is nothing to connect Nicholas or McElroy (or any other Union supporter, for that matter) to any of the vandalism or "threats," or to connect the "threats" to the vandalism. Lake Holiday's "totality of the circumstances" argument is meritless.

## IV.

■ Lake Holiday raises two other issues. Lake Holiday argues that the hearing officer was biased, and that this bias violated its right to due process. Lake Holiday has waived this argument because it did not raise the argument during the representation proceeding. A party may not raise for the first time in an unfair labor practice proceeding issues it could have raised in an earlier representation proceeding. See *N.L.R.B. v. Aaron's Office Furniture Co.*, 825 F.2d 1167, 1171–73 (7th Cir.1987); *Tuf–Flex Glass*, 715 F.2d at 294–295 n. 1.

■ Lake Holiday argues that cases like *Aaron's Office Furniture* and *Tuf–Flex Glass* stand only for the proposition that when an employer fails to object to an election within the five-day period the Board's rules set, the party waives its objections. That is true, and that is exactly what happened here. Lake Holiday never argued bias in its objections to the Hearing Officer's recommendation, or in its briefs to the Board concerning those objections. Objecting on three grounds no more alerts the Board to a fourth ground than filing no objections at all. To preserve a specific ground for review, whether before a court or the Board, a party must raise that specific ground.

■ Lake Holiday argues that it could not raise its bias argument in its original objections because it could not obtain the audio tapes of the proceeding before the Hearing Officer, tapes Lake Holiday says are essential to demonstrating the Hearing Officer's bias. See *Tuf–Flex Glass*, 715 F.2d at 295 n. 1 (exception to waiver rule where previously unchallenged conduct is newly discovered, or information about it was unavailable). This does not, however, excuse Lake Holiday from failing to argue bias at all in its original objections or briefs. Lake Holiday could have at least presented its bias argument based on the record available at the time, and explained that the unavailable tapes would support its argument.

■ Lake Holiday also argues that it preserved its bias argument by objecting to the Hearing Officer's credibility determinations and evidentiary rulings, on which its bias argument is partially based. But that is not the same thing as objecting to bias; perfectly objective judges often make mistakes during hearings. Lake Holiday points to one sentence at the end of one of its briefs on the original objections, which

stated that "the Hearing Officer's unsupported and arbitrary conclusions demonstrate a predisposed position." However, an unsupported (by either authority or argument) throw-away sentence at the end of a brief does not preserve an issue for review. The Board did not have a fair opportunity to consider the bias argument in the representation proceeding. Consequently, Lake Holiday could not properly raise that argument in the unfair labor practice proceeding or before this court.

Finally, Lake Holiday argues the Board improperly granted summary judgment. However, Lake Holiday admitted that it had refused to provide information to or bargain with the Union. Lake Holiday was not entitled to relitigate before the Board in the unfair labor practice proceeding what it did or could have litigated during the representation proceeding. See *Aaron's Office Furniture*, 825 F.2d at 1171. Because there were no factual issues properly before the Board in the unfair labor practice proceeding, the Board properly granted summary judgment.

For the above reasons, the Board's order is enforced.