**NATIONAL LABOR RELATIONS BOARD, Petitioner–Cross–Respondent,**

**International Brotherhood of Electrical Workers, Local 134, AFL–CIO, Intervening Petitioner,**

v.

**CHICAGO TRIBUNE COMPANY, Respondent–Cross–Petitioner.**

Nos. 90–3182 and 90–3499.

United States Court of Appeals, Seventh Circuit.

Argued May 16, 1991.

Decided Sept. 24, 1991.

Elizabeth Kinney, N.L.R.B., Chicago, Ill., Aileen A. Armstrong, Howard E. Perlstein, Marilyn O'Rourke (argued), Appellate Court, Enforcement Litigation, Washington, D.C., for N.L.R.B.

Douglas A. Darch (argued), Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for Chicago Tribune Co.

Robert E. Fitzgerald, Jr., Chicago, Ill., for International Broth. of Elec. Workers, Local 134, AFL–CIO.

Before CUMMINGS, CUDAHY and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

The International Brotherhood of Electrical Workers, AFL–CIO (the Union), won a

representation election among a group of employees of the Chicago Tribune Company (the Company). The Company filed objections to the election. The National Labor Relations Board (the Board) overruled the objections and certified the Union as the bargaining representative of the unit employees. The Union demanded that the Company commence bargaining. When the Company refused to bargain with the Union, the Board determined this refusal to be unlawful and ordered the Company to bargain with the Union. The Board filed an application for enforcement; the Company filed a cross-petition for review. For the following reasons, we deny the petition for review and enforce the order.

## I

## BACKGROUND

The Company and the Union had a relationship, dating back about 40 years, that allowed the Company to obtain many of its electricians through referrals from the union hall. The Union, however, did not have a collective bargaining agreement with the Company. On July 8, 1988, the Union filed a representation petition with the Board seeking to represent the Company's electricians. In a secret-ballot election held on October 4, 1988, the employees selected union representation by a vote of 25–14.

The Company filed several objections to the election. First, the Company contended that the Union threatened employees with forfeiture of their pensions if employees failed to support the Union in the election. The Union's pension required an employee to have at least 20 years of consecutive service and to maintain his membership in good standing until retirement. Under the Union rules, individuals could lose their "membership in good standing" (and thus their pension) by working at a non-union employer, which the Company would become if employees voted against Union representation. Respondent's Br. at 7. A supervisor testified to the regional director that an employee told him that, if the Company won the election, he might lose his pension benefits; the employee did not say,

however, that anyone connected with the Union had so stated. On the basis of this submission, the Company argued that employees were told that they would lose their pensions if they did not vote for the Union.

The Company's second objection to the election was that the Union's steward told a group of three or four employees in August of 1988 that, if the Union lost the election, the Union would "blackball" the employees. Another employee reported that on September 5, 1988, he heard that, if the union lost the election, the employees would be blackballed from working in other union shops in the Chicago area.

The Company also alleged that the Union had promised to grant benefits to employees if they voted in favor of the Union. The Company asserted that employees were promised upgraded credentials and that three workers actually received upgraded credentials in the critical period before the election. Moreover, the Company claimed that the Union made promises to employees that, if the Union won the election, they would receive a Union pension considerably more generous than the then-current pension.

Finally, the Company contended that it should not be required to bargain with the Union because the Union had demonstrated a propensity for invidious racial discrimination. This argument was based on what the Company described as the Union's "long and ignominious history of corruption and discrimination," including admission practices that discriminate against blacks and Hispanics. Respondent's Br. at 10.

The Board's regional director conducted an administrative investigation. Both the Company and the Union were permitted to submit evidence regarding each of the foregoing objections to the election. After reviewing the evidence, the regional director recommended to the Board that each of the Company's objections be overruled. On June 9, 1989, the Board adopted the regional director's findings and recommendations, denied the Company's request for an evidentiary hearing, and certified the Union as

the collective bargaining agent of the unit employees. The Company's request for reconsideration was denied on September 8, 1989.

The Company refused to bargain and the Union filed an unfair labor practices charge. Based on that charge, the Acting General Counsel issued a complaint alleging that the Company's refusal to bargain violated sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 151, *et seq.* On December 11, the General Counsel filed a motion for summary judgment.

On July 11, 1990, the Board determined that all issues raised by the Company were or could have been litigated in the underlying representation proceeding and that the Company had not offered any newly discovered and previously unavailable evidence, nor alleged any special circumstances that would require the Board to reexamine its decision in the representation proceeding. The Board thus granted the motion for summary judgment and issued an order requiring the Company to cease and desist from refusing to bargain with the Union. The Company now seeks review of the Board's order.

## II

## ANALYSIS

### A. *Guiding Principles*

▇▇▇ In several recent decisions, this court has set forth the principles that must guide our decision here. At the outset, we must remind ourselves that our review of the Board's decision to certify a collective bargaining agent following an election is extremely limited. *Van Leer Containers, Inc. v. NLRB*, 841 F.2d 779, 784 (7th Cir. 1988). "We must defer to the Board's reasonable selection of rules and policies to govern the election, and we will uphold the application of those rules if substantial evidence supported the Board's decision." *Id.; see also NLRB v. Browning–Ferris Indust., Inc.*, 803 F.2d 345, 347 (7th Cir.

1986). The burden on the party challenging an election is a formidable one. As Judge Wood wrote in *Van Leer*, the party challenging the election has the burden of showing that substantial evidence does not support the Board's decision. *Van Leer*, 841 F.2d at 784. To meet this burden, the objecting party must show that the unlawful acts occurred and "that those acts interfered with the employees' exercise of free choice to such an extent that they materially affected the results of the election." *NLRB v. Service Am. Corp.*, 841 F.2d 191, 195 (7th Cir.1988).[1] When presented with such allegations, the regional director is required to hold an evidentiary hearing if there are "substantial and material factual issues." 29 C.F.R. § 102.69(d); *see generally NLRB v. ARA Serv., Inc.*, 717 F.2d 57, 63–64 (7th Cir.1983). "[T]he regional director must hold a hearing when the employer presents facts 'sufficient to support a prima facie showing of objectionable conduct,' that is, of 'misconduct sufficient to set aside the election under the substantive law of representation elections.'" *NLRB v. Lovejoy Indus., Inc.*, 904 F.2d 397, 400 (7th Cir.1990) (quoting *Service Am. Corp.*, 841 F.2d at 195). The decision of whether to hold an evidentiary hearing requires the Regional Director to draw upon a great deal of expertise about the labor relations environment. As Judge Easterbrook wrote in *Lovejoy Industries*,

a decision not to hold a hearing when confronted with certain evidence amounts to a decision that this evidence is not a prima facie case of *enough* misconduct to set aside an election. That is the sort of decision the Board was established to make, and to which the courts must defer. Additional hearings mean additional delay. Congress insulated from judicial review the decision to certify a union as bargaining representative precisely because it was concerned about the baleful effects of delay.

904 F.2d at 402.[2] Consequently, in reviewing the decision not to conduct an evidentia-

---

1. *See also, Van Leer Containers, Inc. v. NLRB*, 841 F.2d 779, 787 (7th Cir.1988) (Board must determine whether Union statements reasonably can be construed as tending to intimidate or coerce employees to vote in the Union's favor).

2. *See also NLRB v. Precise Castings, Inc.*, 915 F.2d 1160, 1164 (7th Cir.1990) ("Rerunning elec-

ry hearing on the Company's objection, we must consider whether substantial evidence supported the Board's determination that the Company did not present a prima facie case for setting aside the election. *See Van Leer*, 841 F.2d at 784; *NLRB v. Affiliated Midwest Hosp., Inc.*, 789 F.2d 524, 527 (7th Cir.1986).

## B. *The Company's Allegations*

### 1. Threat of loss of pension rights

■ The Company alleged that Union agents threatened employees with loss of their pension rights if they failed to support the Union in the election. But the only evidence the Company proffered to the regional director was one supervisor's statement that an employee had told him that, if the Company won the election, the employee might lose his pension rights. The supervisor also stated that the employee had not indicated that anyone connected with the Union had told him that he might lose his pension rights. Moreover, when interviewed by the regional director, the employee stated that *no one* had *ever* told him that if the Union lost the election he would lose his pension rights. *See* Respondent's App. at 8. In short, substantial evidence supports the Board's decision to overrule this objection. The Company presented no evidence that in any way demonstrates that the alleged threats either were made by the Union or interfered with the results of the election.

■ The Company also points to provisions in the Union's constitution and bylaws that allegedly require the forfeiture of pension rights if an employee works for a non-union employer (which the Company contends it would be considered if it lost the election). In its brief, the Company

occasionally suggests that the mere existence of these provisions is sufficient to invalidate the election. The Company contends that because these provisions were in effect during the critical period before the election and because at least one employee knew about them, the election must be set aside. In other portions of its brief, the Company appears to recognize that the existence of such provisions must be communicated to employees in order to vitiate an election. In any event, the Company has pointed to no case in which the Board has overturned an *election* absent a showing that the threat—be it oral or written—was disseminated to employees.[3] That the Board would require the party challenging the results of an election to demonstrate more than a technical violation is hardly surprising: the Board is not required "to treat employees as if they were bacteria on a petri dish that must be kept free from contamination." *Lovejoy Indus.*, 904 F.2d at 402. Rather, the Board utilizes its expertise to determine how much misconduct is too much misconduct to guarantee that the result of the election truly reflects the choice of the employees. The Board, as we have indicated above, thus evaluates an objection to an election to determine whether the evidence establishes "interference with employee free will such that the election should be overturned." *Van Leer*, 841 F.2d at 785.

Here, however, we believe that the Company has failed to demonstrate that any employee actually knew of the pension provisions. In fact, the Company can point to the testimony of no employee who has stated that he was aware of these provisions. Because the Company has not proffered specific evidence from or about any em-

tions, or litigating about their validity, may frustrate indefinitely the implementation of the employees' legitimate selection. Choosing how much imperfection to accept is for the Board."), *cert. denied*, — U.S. —, 111 S.Ct. 1581, 113 L.Ed.2d 646 (1991).

**3.** The Company cites *Hancock Fabrics*, 294 N.L.R.B. No. 4 (1989); *Lynn Edwards Corp.*, 290 N.L.R.B. No. 28 (1988); *Sheet Metal Workers Local 16 (Salem Heating)*, 274 N.L.R.B. 41 (1985), enf'd, 873 F.2d 236 (9th Cir.1989); and *Engineers & Scientists Guild (Lockheed–California)*, 268 N.L.R.B. 311 (1983), for the proposi-

tion that the mere maintenance of an illegal provision requires setting aside the election. Yet these cases are inapposite because the Board considered only whether the maintenance of particular provisions constituted an unfair labor practice, not whether the maintenance of the provisions was grounds for overturning an election. The Company also points us to several cases in which threats clearly were disseminated to the employees before the election. *See Benjamin Coal Co.*, 294 N.L.R.B. No. 44 (1989); *Dal–Tex Optical Co.*, 137 N.L.R.B. 1782 (1962).

ployee from which it reasonably could be inferred that the provisions tended to coerce employees, we must reject the Company's challenge. *See NLRB v. Service Am. Corp.*, 841 F.2d 191, 195 (7th Cir. 1988). The Company has not shown that the pension provision "provoke[d] reasonable concern among employees that their jobs would be in jeopardy if they did not vote for Union representation." *Van Leer*, 841 F.2d at 787. "Simply put, the Company has not proffered any evidence to show that any employee was even cognizant of the allegedly illegal provisions, much less intimidated or coerced by their mere existence, and absent a showing of a nexus between those provisions and the election campaign, the Company's assertion must be rejected." Petitioner's Br. at 10–11.

### 2. Threat to blackball employees

■ The Company contended that Union agents threatened employees with the loss of employment opportunities if they failed to support the Union in the election. One employee stated that he heard a Union steward tell a group of employees that, if the Union did not win the election, the Union would blackball the employees from working in any union shops in the area. The employee named two other unit employees who were present and a non-unit employee and another unit employee who he thought might have been present at the time. The employee who indicated that he overheard the steward's statement also stated that he did not tell any other employees that the steward made the alleged threat. Another employee stated that he heard a rumor from other employees that if the Union lost the election, the employees would be blackballed from working in other union shops in the Chicago area. That employee also stated that no one from the Union ever told him that it would blackball employees if it lost the election.

In overruling this objection, the Board assumed that the union steward was an agent of the Union. But the Board found that the statement regarding blackballing did not constitute objectionable conduct because the threat was made approximately two months prior to the election, the threat was never renewed, and the threat was never disseminated among unit employees. *See* Respondent's App. at 27. In short, the Board determined that the Company did not present evidence of enough misconduct to warrant an evidentiary hearing; substantial evidence supports this determination. As the Board noted, there was a considerable period of time between the steward's statement and the election,[4] and the Company failed to show that the threat was ever renewed near the time of the election.[5] Moreover, the alleged threat does not appear to have been disseminated.[6] Substantial evidence thus supports the Board's decision to overrule this objection.

### 3. Issuance of apprenticeship cards

■ The Company had a practice of requesting union credentials when it hired an electrician. The Union would then issue credentials that would allow the individual to work with other union members. The

---

**4.** The unit employee who heard the alleged threat testified that it was made sometime in August of 1988. The election was held on October 4, 1988.

**5.** *Cf. Westwood Horizons Hotel*, 270 N.L.R.B. 802, 802–03 (1984) (election overturned where threats made two weeks before election and on day of election); *United Broadcasting Co. of New York*, 248 N.L.R.B. 403, 403–04 (1980) (election overturned where threats made two and three days before election).

**6.** The Company contends that, because several employees discussed a rumor of possible blackballing, it has shown dissemination of the Union threat. At the very least, argues the Company, dissemination should be presumed in this case.

The regional director reasoned that, "while employees may have discussed being 'blackballed' during the election campaign this discussion was merely employee speculation which was never linked to any threat, overt or implied, by anyone associated with the [Union]. If the Board were to consider mere employee speculation of the possibility of retaliation by the losing party to an election as objectionable conduct, it would be impossible to conduct valid elections." Respondent's App. at 11. In *NLRB v. Lovejoy*, 904 F.2d 397, 402 (7th Cir.1980), this court determined that employee speculation is insufficient to invalidate an election. Thus, we believe that the Board correctly refused to hold an evidentiary hearing on this basis.

company charged that the Union made representations to it about the criteria for various credentials but, contrary to those representations, gave undeserved credentials to workers in order to induce them to vote for the Union. The regional director interviewed the workers and the union officials. On the evidence presented, the Board overruled this objection, holding that the evidence could not support the conclusion that the three apprentices were offered their cards in exchange for supporting the Union in the election. "Rather, the evidence shows that the apprentices were issued 'B' apprentice cards by the [Union] based on the past practice between the parties." Respondent's App. at 16.

Substantial evidence supports the Board's determination. The Company has not presented evidence that the Union issued apprentice cards outside of the "normal course of business" in order to influence the vote in the election. *St. Francis Fed'n of Nurses & Health Professionals v. NLRB*, 729 F.2d 844, 850 (D.C.Cir.1984). In fact, after reviewing the evidence presented to the regional director, it appears that the apprenticeship cards were issued as soon as the Union became aware that the apprentices had been employed for more than one year and that this was the Union's normal practice. Therefore, because there was no change in the status quo with regard to employee benefits, the Union's issuance of the apprenticeship cards did not interfere with the election. *See Gossen Co. v. NLRB*, 719 F.2d 1354, 1356 (7th Cir.1983).

### 4. Credibility determinations

■ With respect to each of these allegations, the Company also contends that the regional director erred by resolving credibility disputes on the basis of his *ex parte* interviews. According to the Company, the regional director impermissibly relied on his interviews to draw inferences and resolve substantial and material factual issues. However, as we have already noted, a hearing is required only when the objecting party raises substantial and material factual issues. "To meet this burden, the objecting party must allege misconduct

sufficient to set aside the election under the substantive law of representation elections and proffer 'specific evidence from or about specific people.'" *NLRB v. Service Am. Corp.*, 841 F.2d 191, 195 (7th Cir.1988) (quoting *NLRB v. Douglas County Election Membership Corp.*, 358 F.2d 125, 130 (5th Cir.1966)). Here, however, the Company has proffered no specific evidence of conduct sufficient to set aside the election. Indeed, our review of the record indicates that the hearing officer accepted as true the Company's allegations, but considered these allegations insufficient to set aside the election. The Company's contention that employees feared losing their pension rights was accepted as true, but found insufficient to warrant an evidentiary hearing because these employee fears were not attributable to any statement made by the Union; the Company's contention that a union steward threatened employees with "blackballing" was accepted as true, but found insufficient to invalidate the election because these threats were temporally distant from the election and had not been disseminated to other employees; the Company's allegation that the Union issued apprenticeship cards was accepted as true, but found insufficient to overturn the election because these cards were issued pursuant to established practice. In short, the regional director did not make credibility determinations in recommending to the Board that the Company's objections be overruled. Rather, the regional director merely evaluated the significance of the Company's objections and determined that the alleged misconduct did not raise substantial and material issues of fact. Given our deferential review of the Board's decision not to hold a hearing, we cannot say that the Board's decision is not supported by substantial evidence. *See Lovejoy Indus., Inc.*, 904 F.2d at 400 ("There may be 'substantial' evidence behind the regional director's action even though a court with the power of de novo review would have found the decision wanting.").

### C. *Alleged Union Racial Discrimination*

■ The Company contends the Union should have been denied certification because the Union allegedly discriminates against employees on the basis of race.

Therefore, argues the Company, this court should remand for a hearing on the Company's evidence of discrimination. In rejecting this argument, the Board stated that "[i]t is well settled that allegations of racial discrimination are properly cognizable under the duty of fair representation and must be adjudicated under Sec. 8(b) of the Act and cannot constitute a defense to an 8(a)(5) proceeding." Respondent's App. at 30.

In *Handy Andy, Inc.*, 228 N.L.R.B. 447 (1977), the Board established that employer allegations of union racial discrimination will not be entertained as a defense to a refusal to bargain unless that allegation relates to unfairness in the election itself.[7] "[B]ecause of the essentially nonadversary nature of representation proceedings, we believe that allegations of invidious discrimination should be considered in such proceedings only when required to fulfill our primary obligation of protecting employees from interference in exercising their right to select a bargaining representative." *Id.* at 454. To consider in representation proceedings claims of union discrimination unrelated to the election, reasoned the Board, would provide employers with "an incentive to inject charges of union racial discrimination into Board certification and bargaining order proceedings as a delaying tactic in order to avoid collective bargaining altogether rather than to attack racial discrimination." *Id.* at 453.[8]

Here, the Company has not provided concrete evidence that the alleged union discrimination was in any way related to the election or the pre-election campaign. The Company alleges that a number of charges of discrimination have been filed against the Union, that the Union has been named in at least one lawsuit for its discriminatory practices, that it has attempted to disobey court orders, and that the Union probably has denied membership to minorities on racial grounds. However, under *Handy Andy*, because these allegations are unrelated to the election process, an evidentiary hearing was not required.[9]

## CONCLUSION

For the reasons stated above, the Board's application for enforcement is granted, and the Company's cross-petition for review is denied.

APPLICATION FOR ENFORCEMENT GRANTED; CROSS-PETITION FOR REVIEW DENIED.

---

7. The Board's decision in *Handy Andy* explicitly overruled its prior holding in *Bekins Moving & Storage Co.*, 211 N.L.R.B. 138 (1974).

8. The Board also reasoned that

   [E]ven a union which practices some unlawful discrimination may be the best one available in the opinion of the workers in the unit, who are given the right to decide for themselves under the Act. Even if minority members of the unit are convinced that the union will fairly represent them, and vote for the union under the Bekins approach, a bargaining order may still have to be denied. Yet, the minority workers might not be helped by

keeping the union out, since they then will be at the mercy of their employer who has no duty of fair representation to fulfill, who may act to the detriment of all the workers, and who may also discriminate against minorities. In short, a union that has discriminated in the past and still has a racial imbalance may be preferable for minority workers to no union at all.

*Handy Andy, Inc.*, 228 N.L.R.B. 447, 452–53 (1977).

9. The Company argues that *Handy Andy* has not been favorably received by the courts. We disagree. Although the Company argues that several courts have expressed an inclination to

---

follow cases approximating the *Bekins* approach, no court has explicitly rejected *Handy Andy.* In fact, the cases cited by the Company are easily reconciled with *Handy Andy,* since the pre-*Handy Andy* cases approvingly cited involved allegations that racial prejudice some-

how tainted the election itself. *See, e.g., NLRB v. Sumter Plywood Corp.,* 535 F.2d 917, 931 (5th Cir.1976) (allegations of racially oriented election campaign), *cert. denied,* 429 U.S. 1092, 97 S.Ct. 1105, 51 L.Ed.2d 538 (1977).