**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 14-1517**

─────────────

INTERTAPE POLYMER CORP.,

        Petitioner,

    v.

NATIONAL LABOR RELATIONS BOARD,

        Respondent.

─────────────

**No. 14-1553**

─────────────

NATIONAL LABOR RELATIONS BOARD,

        Petitioner,

    v.

INTERTAPE POLYMER CORP.,

        Respondent.

─────────────

On Petition for Review and Cross-application for Enforcement of an Order of the National Labor Relations Board. (11-CA-077869; 11-CA-078827; 10-CA-080133; 11-RC-076776)

─────────────

Argued: May 13, 2015        Decided: September 8, 2015

─────────────

Before TRAXLER, Chief Judge, and WILKINSON and FLOYD, Circuit Judges.

─────────────

Petition for review granted in part and denied in part; cross-application for enforcement granted in part, denied in part and remanded by published opinion. Chief Judge Traxler wrote the opinion, in which Judge Wilkinson and Judge Floyd concurred. Judge Wilkinson wrote a separate concurring opinion.

————————————

**ARGUED:** Reyburn Williams Lominack, III, FISHER & PHILLIPS LLP, Columbia, South Carolina, for Petitioner/Cross-Respondent. Nicole Lancia, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent/Cross-Petitioner. **ON BRIEF:** Michael D. Carrouth, FISHER & PHILLIPS LLP, Columbia, South Carolina, for Petitioner/Cross-Respondent. Richard F. Griffin, Jr., General Counsel, Jennifer Abruzzo, Deputy General Counsel, John H. Ferguson, Associate General Counsel, Linda Dreeben, Deputy Associate General Counsel, Elizabeth A. Heaney, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent/Cross-Petitioner.

————————————

TRAXLER, Chief Judge:

Intertape Polymer Corporation ("Intertape") petitions for review of a National Labor Relations Board ("NLRB" or "Board") order concluding that Intertape committed three unfair labor practices prior to and during the course of a union campaign, in violation of Section 8(a)(1) of the National Labor Relations Act (the "NLRA" or "Act"), 29 U.S.C. § 158(a)(1), and directing that a second election be held based upon two of the three violations. The Board cross-petitions for enforcement of its order in full. For the reasons set forth below, we grant Intertape's petition for review in part and deny it in part, grant the Board's cross-petition for enforcement in part and deny it in part, and remand for further proceedings.

I.

Intertape operates an adhesive tape manufacturing facility in Columbia, South Carolina. In January 2012, the United Steel, Paper & Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO-CLC ("the Union"), launched a campaign to organize the facility's production and maintenance employees. The Union filed its representation petition with the Board on March 16, 2012. On April 26 and 27, a secret-ballot election was held. The Union lost the election by a vote of 142 votes against and 97 votes for the Union.

Both prior to and after the election, the Union filed with the Board numerous unfair labor practice charges against Intertape. The Union also filed objections to the completed election, seeking to set it aside based upon unlawful conduct allegedly occurring during the "critical period" from March 16, the filing date of the petition, to April 27, the last day of the election. J.A. 26. On July 26, 2012, the Board's Acting General Counsel issued a complaint against Intertape (the "Complaint").

Following a hearing, an administrative law judge ("ALJ") found that Intertape had violated Section 8(a)(1) of the Act by: (1) interrogating employee Johnnie Thames regarding his views about the union; (2) confiscating union literature from an employees' break room; (3) surveilling employees' union activities by leafleting at the plant gate at the same time that union supporters were leafleting; and (4) threatening employees that selecting the union as its collective-bargaining representative would be futile. Based upon the latter three violations, the ALJ also recommended that the election be invalidated and that a second election be held.[1]

---

[1] Because the single incident of unlawful interrogation of Thames occurred before the Union filed its representation petition, it was not objectionable conduct occurring within the critical period or a basis for setting aside the election.

4

On review, the Board agreed that Intertape had violated Section 8(a)(1) by unlawfully interrogating Thames in February 2012; unlawfully confiscating union literature from the employee break room in March 2012; and unlawfully surveilling union activities in April 2012 by leafleting at the plant gate during the periods of time that union supporters were leafleting. The Board rejected the ALJ's finding that Intertape had threatened employees with futility. However, the Board set aside the election results and ordered a new election, based solely upon the confiscation and surveillance violations.[2]

For the following reasons, we conclude that the Board correctly determined that Intertape unlawfully interrogated employee Thames and unlawfully confiscated union materials from the employee break room, but that the Board erred in holding that Intertape engaged in unlawful surveillance of union activities.

## II.

On review of orders issued by the NLRB, "we must affirm the Board's factual findings if they are supported by substantial

---

[2] Board member Miscimarra dissented in part. He would have dismissed the interrogation and surveillance allegations. He would also have certified the election result because Intertape's alleged misconduct, even if it included the purported surveillance, was "'so minimal or isolated that it [was] virtually impossible to conclude that the misconduct could have affected the election results.'" J.A. 682 (quoting Long Drug Stores Cal., 347 N.L.R.B. 500, 502 (2006)).

evidence on the record considered as a whole." Medeco Sec. Locks, Inc. v. NLRB, 142 F.3d 733, 742 (4th Cir. 1998) (internal quotations marks omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. (internal quotation marks omitted). "We must affirm the Board's interpretations of the NLRA if they are rational and consistent with the Act." Id. (internal quotation marks omitted).

Under Section 7 of the NLRA, employees are guaranteed "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157.

Pursuant to Section 8(a)(1) of the Act, it is "an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7" of the Act. 29 U.S.C. § 158(a)(1). An employer's actions violate Section 8(a)(1) if "the conduct in question had a reasonable tendency in the totality of the circumstances to intimidate." NLRB v. Nueva Eng'g, Inc., 761 F.2d 961, 965 (4th Cir. 1985).

However, "[t]he prohibition set forth in § 8(a)(1) is limited by [the protection granted by] § 8(c)." J.P. Stevens &

6

Co. v. NLRB, 638 F.2d 676, 684 (4th Cir. 1980). Section 8(c) provides that:

> [t]he expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act, if such expression contains no threat of reprisal or force or promise of benefit.

29 U.S.C. § 158(c).

### III.

#### A. The Employee Interrogation Violation

We begin with the Board's conclusion that Intertape violated § 8(a)(1) by interrogating employee Johnnie Thames in February 2012 about his union sentiments.

Although an employer's "[q]uestioning or interrogation of employees about their union sentiments is not per se unlawful" under the Act, such questioning will rise to the level of a Section 8(a)(1) violation if it is coercive in nature. Nueva Eng'g, 761 F.2d at 965. "In making a determination of coerciveness, [we] must consider a variety of factors including the history of employer hostility to the union, the nature of information sought, the identity of the questioner, and the place and method of questioning." Id. at 966. We have also considered whether the questioner "explained the purpose of [the] question" or provided "any assurances against retaliation," id., and whether the employee was reluctant to

7

discuss unionization, see Standard-Coosa-Thatcher Carpet Yarn Div., Inc. v. NLRB, 691 F.2d 1133, 1137, 1139 (4th Cir. 1982).

In December of 2011, Thames was disciplined by his immediate supervisor, Bill Williams, for arguing with Williams. On February 10, 2012, Thames signed a union authorization card. According to Thames, Williams approached him at his work station approximately two or three weeks later and asked him what he thought of the union. Williams also told Thames that "if you don't think it's good then, that it can hurt you." J.A. 234. Thames walked away without responding. Williams denied asking Thames about the union.

The ALJ credited Thames' "detailed account" of the conversation with Williams and his "strong recall of th[e] discussion," J.A. 685, over Williams' "general denial" that any such exchange occurred. J.A. 685-86. The ALJ also found that Williams' questioning of Thames, under the totality of the circumstances, was sufficiently coercive to have made Thames feel restrained from exercising his rights under Section 7.

The Board balanced the relevant factors and agreed. As noted by the Board:

> Williams directly asked Thames to reveal his view of the Union. Although a low-level supervisor, Williams was Thames' direct supervisor, reasonably tending to make the questioning that much more threatening. Williams, moreover, offered no justification for his questioning or assurances against reprisals. The preexisting hostility between Williams and Thames and

8

> Thames' unwillingness to answer Williams further weigh in favor of finding a violation.  Last, we find that Williams' comment that "it can hurt you" would have exacerbated the already coercive nature of his inquiry into Thames' opinion of the Union.

J.A. 679 (internal citations and footnotes omitted).

On appeal, we must accept the Board's factual findings based on credibility determinations "absent extraordinary circumstances."  WXGI, Inc. v. NLRB, 243 F.3d 833, 842 (4th Cir. 2001) (internal quotation marks and alteration omitted). "Exceptional circumstances include those instances when a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all."  Id. (internal quotation marks omitted).  No such circumstances exist here.  The ALJ observed the testimony of Thames and Williams and explained why he credited Thames' account of the conversation over Williams' denial that it occurred.

We hold that substantial evidence supports the Board's determination that Williams' questioning of Thames about his union sentiments, as described by Thames, was sufficiently coercive or intimidating to render it an unfair labor practice under the Act.  Accordingly, we deny Intertape's petition for review and grant enforcement of this portion of the Board's order.

B.   The Confiscation Violation

We next consider the Board's conclusion that Intertape violated Section 8(a)(1) by confiscating union flyers that a union supporter had placed in the employee break room.

"Soliciting support for a union and distributing union materials are among the core activities safeguarded by § 7." Consolidated Diesel Co. v. NLRB, 263 F.3d 345, 352 (4th Cir. 2001); see also Beth Isr. Hosp. v. NLRB, 437 U.S. 483, 491–92 (1978) ("[T]he right of employees to self-organize and bargain collectively [under Section 7] necessarily encompasses the right effectively to communicate with one another regarding self-organization at the jobsite.").  "The workplace is uniquely appropriate for such activities, so long as the activities are conducted in nonwork areas during nonwork time, and in a non-abusive manner." Consolidated Diesel, 263 F.3d at 352 (internal quotation marks and citations omitted).

Ordinarily, therefore, "an employer may not confiscate union literature left for distribution to employees in nonwork areas during nonwork time." Id. at 354.  On the other hand, an employer's enforcement of a valid housekeeping policy that results in the incidental disposal of union literature will not rise to the level of interference with the employee's protected Section 7 activities.  Cf. Standard-Coosa-Thacker, 691 F.2d at 1141.  In other words, an employer "has every right to keep its

10

workplace clean," but that right will not prevail where "substantial evidence supports the Board's view that cleanliness was not [the] issue." Consolidated Diesel, 263 F.3d at 354.

Prior to and during the union campaign, Intertape maintained a solicitation and distribution rule that prohibited such activities during working time and in working areas. Working time was defined as "the time employees are expected to be working and does not include breaks, meals, before the shift starts, and after the shift ends." J.A. 33. Consequently, the distribution of union flyers in the employee break room was not prohibited.

The Complaint alleged that in March 2012, "including on March 23 and 29," Supervisor Bill Williams enforced Intertape's distribution rule "selectively and disparately, by prohibiting union distributions in non-work areas, while permitting nonunion distributions in non-work areas." J.A. 33. At the hearing, employee Faith Epps testified that she placed union flyers on the counter in the employee break room, where such distributions were permitted. Epps testified that on three occasions in March, she observed Williams go into the break room immediately after the employee shift break and remove the flyers. Epps also testified that, prior to the union campaign, literature left in the break room, such as newspapers and magazines, was left untouched until at least the end of the work day. Epps also

11

testified that she could not recall seeing Intertape supervisors cleaning up or removing literature from the break room until after the union campaign began. Williams admitted discarding the union literature along with the other "[n]ewspapers, magazines, menus," and trash that had been left in the break room, but he testified that he only did so as a part of his normal housekeeping duties. J.A. 528.

The ALJ found that Intertape, through Williams, had unlawfully confiscated union literature from the break room. The Board agreed, and additionally found that Intertape had changed its policy regarding distributions in the break room "as a reaction to and countermeasure against the union campaign." J.A. 679.

### 1.

As an initial premise, Intertape argues that the Board erred in finding that it had violated Section 8(a)(1) by confiscating union literature from the break room because the violation was not closely related to the allegation set forth in the Complaint, nor fully and fairly litigated at the hearing. We disagree.

"It is well settled that the Board may find and remedy a violation even in the absence of a specified allegation in the complaint if the issue is closely connected to the subject matter of the complaint and has been fully litigated."

12

Pergament United Sales, Inc., 296 N.L.R.B. 333, 334 (1989); see Owens-Corning Fiberglas Corp. v. NLRB, 407 F.2d 1357, 1361 (4th Cir. 1969) ("All that is requisite in a valid complaint before the Board is that there be a plain statement of the things claimed to constitute an unfair labor practice that respondent may be put on his defense. Such a complaint need state only the manner by which the unfair labor practice has been or is being committed, the absence of specifics being tolerated where there has been no special showing of detriment.") (internal quotation marks and citation omitted); see also Pergament United Sales, Inc. v. NLRB, 920 F.2d 130, 134 (2d Cir. 1990) ("In the context of the Act, due process is satisfied when a complaint gives a respondent fair notice of the acts alleged to constitute the unfair labor practice and when the conduct implicated in the alleged violation has been fully and fairly litigated.").

Intertape complains because, prior to the hearing, it had only been accused of disparately enforcing its distribution policy, and not of changing its housekeeping policy. With regard to the Pergament test, the Board held that:

> Even if [Intertape] is correct that this is not the precise theory of the complaint, which alleged that the Respondent 'enforced the rule . . . selectively and disparately, by prohibiting union distributions in non-work areas, while permitting nonunion distributions in non-work areas," the issue of a change in the [Intertape's] practice is closely related to the subject matter of the complaint and has been fully litigated.

13

J.A. 679 n.8. The Board additionally found it significant that Intertape "does not argue that lack of notice prevented it from introducing exculpatory evidence or that it would have altered its litigation strategy had the allegation been pleaded in this manner." J.A. 679 n.8.

We find no error in the Board's decision. The allegation in the Complaint and the violation found by the Board both present the core issue of whether Williams' handling of the union material left by Epps in the employee break room interfered with the employees' Section 7 rights. From the inception of the Complaint, Intertape knew that the General Counsel would take issue with the manner in which Williams handled the union literature within the narrow time frame specified, and Intertape had ample opportunity to prepare for and rebut the claim that Williams was discarding union literature in a manner that differed from Intertape's pre-campaign practices. Moreover, Intertape did not claim lack of notice at the hearing as the testimony evolved, nor did it ask for a continuance in order to present new or different testimony regarding its housekeeping or distribution policies.

Accordingly, we hold that the Section 8(a)(1) confiscation violation was closely related to the allegation set forth in the complaint, and it was fully and fairly litigated at the hearing.

Turning to the merits of Intertape's challenge to the confiscation violation, we hold that substantial evidence supports the Board's determination that Williams' removal of the union literature from the break room was an unfair trade practice under the Act.

Although Intertape admits that Williams removed union literature from the break room, it asserts that the General Counsel failed to prove that Intertape changed its distribution or housekeeping policies during the critical period or that it did so in response to union activity. We are unpersuaded.

As noted above, Epps testified that literature left by employees in the break room prior to the union campaign was routinely left undisturbed until the end of the day, and that the supervisors were not known to engage in prompt housekeeping activities after each employee break. Her testimony was also corroborated by that of a second employee, John Jordan, who testified that he was told by another supervisor that he could not distribute union literature in the break room.

Because substantial evidence supports the Board's conclusion that Intertape unlawfully confiscated union literature in violation of the Act, we deny Intertape's petition for review and grant enforcement of this portion of the Board's order as well.

## C.  The Surveillance Violation

Finally, we turn to the Board's conclusion that Intertape engaged in excessive or coercive surveillance when it handed out leaflets at the plant gate to arriving employees at the same time that union supporters were handing out leaflets.  For the reasons set forth below, we hold that the Board's decision is not supported by substantial evidence and is contrary to law.

### 1.

The facts pertaining to this violation are largely undisputed.  On April 24, two days before the secret-ballot election began, Intertape supervisors stood near the turnstiles at the plant entrance and distributed a "Thank You" flyer to arriving employees from approximately 6:30 a.m. to 7:00 a.m.[3]  No union supporters were leafleting at the time.

---

[3] The flyer was signed by plant supervisors and contained the following message:

> Soon, you will be able to vote on whether you want to be represented by a union or not.  Although we do not have a vote, we have tried to give you the information you need to make a good decision.  We hope you will base your decision on the facts and what you truly believe will put this plant in the best position to move forward.

> While we certainly hope you believe a union is unnecessary and you will vote no, we need this matter behind us on Friday.  We have all learned a lot about ourselves and our plant through this union campaign.  Regardless of your position on this matter, we all

(Continued)

That afternoon, Intertape supervisors returned to the plant gate and distributed the flyers from approximately 6:30 p.m. to 7:00 p.m. After the supervisors arrived and began distributing the flyers, union supporters joined them at the gate and began simultaneously distributing union literature. The union supporters positioned themselves approximately five feet on the other side of the turnstiles from the supervisors.

On the morning of April 25, the supervisors returned to the turnstiles and again distributed the flyers from approximately 6:30 a.m. to 7:00 a.m., unaccompanied by the union supporters. That evening, both the supervisors and the employees distributed their respective flyers from opposite sides of the turnstiles, but on this occasion the union supporters arrived first.

There is no evidence that the supervisors knew that the union supporters intended to hand out leaflets at the gate on the two afternoons in question, or that they were otherwise present at the gate for the purpose of spying on employees. Although union supporters had briefly leafleted at the gate on March 22 and 23, shortly after the representation petition was filed, they had not done so during the intervening month-long

---

need to put as much effort into working together on our plant as we have in addressing the union election.

J.A. 640. The content of the flyer is not alleged to be coercive or otherwise violative of the Act.

17

campaign. Nor was there evidence that the union supporters had planned ahead of time to leaflet on the afternoons of April 24 and 25. During the periods of simultaneous leafleting, the supervisors did not say anything, beyond pleasantries, to the union supporters or to the arriving employees. They did not take pictures or notes of the employees as they arrived, nor did they otherwise engage in threatening or intimidating behavior towards the union supporters or the arriving employees.

The Board, however, held that Intertape engaged in "unlawful surveillance" of the union activities because the supervisors' leafleting at the gate was "'out of the ordinary,'" insofar as there was no evidence that Intertape had communicated with its employees in this manner "prior to the campaign," and because the supervisors could "see" the employees during the periods of simultaneous leafleting. J.A. 679 (emphasis added).[4]

---

[4] Specifically, the Board found that the supervisors' leafleting became coercive surveillance merely because:

> The presence of supervisors at the plant gate where employees arrived and left was itself unusual. Further, management officials typically communicated with employees in meetings, and there was no evidence that, prior to the campaign, it had leafleted its own employees. As the [ALJ] found, the Respondent's supervisors could see not only the employees distributing leaflets, but also which employees accepted or rejected the leaflets, and any interactions between them.

J.A. 679 (citations omitted).

18

The Board "attribute[d] no relevance to which group of leafleters arrived first," because "the employer's [leafleting] activity [was] out of the ordinary." J.A. 679 n.9. As to Intertape's argument that "it was simply exercising its Section 8(c) right to communicate with its employees," the Board summarily rejected it as well, explaining that "such communication is [nonetheless] unlawful if it includes out-of-the-ordinary conduct that places employees' union activities under surveillance." J.A. 679-80.

2.

It has long been established that an employer's act of observing its employees on company property during union activities, even when done in close proximity to its employees, is not a per se violation of the Act. On the contrary, "union representatives and employees who choose to engage in their union activities at the employer's premises should have no cause to complain that management observes them." Belcher Towing Co. v. NLRB, 726 F.2d 705, 709 (11th Cir. 1984) (per curiam) (internal quotation marks omitted); Emenee Accessories, Inc., 267 N.L.R.B. 1344, 1344, 1349 (1983) (finding no violation where supervisor "stationed himself at the entrance to the building for the purpose of observing the Union's efforts" and "observed the union organizers conversing with employees who were reporting for work"); Milco, Inc., 159 N.L.R.B. 812, 814 (1966)

19

(finding no violation where management representatives watched union organizers who were handing out leaflets and talking to employees as they were leaving the plant; the employer had a legitimate reason for being there and there was "no evidence that any management representatives made notes or otherwise recorded what they saw," notwithstanding that they could see the interactions between the employees and the union organizers).

The exception to this general rule arises when the employer's observation of union activities can be reasonably construed as excessive or coercive surveillance, such that it "unreasonably chill[s] the exercise of the[] employees' Section 7 rights." NLRB v. Southern Md. Hosp. Ctr., 916 F.3d 932, 938 (4th Cir. 1990) (per curiam) (noting that "the Board has on several occasions found that employers unreasonably chilled the exercise of their employees' Section 7 rights through excessive surveillance") (emphasis added); cf. NLRB v. Arrow-Hart, Inc., 203 N.L.R.B. 403, 403 (1973) (noting that an employer's act of "coercively surveilling – that is, spying upon – its employees' activities" would be a violation of the Act). As stated previously, the employer's observation must have a "reasonable tendency in the totality of the circumstances to intimidate" the employees. Nueva Eng'g., 761 F.2d at 965.

This is because, "[w]hen an employer watches . . . employees because he believes they are engaged in union

20

activities, the employees may reasonably fear that participation in union activities will result in their identification by the employer as union supporters." Id. at 967. The "employee, possibly anticipating retaliation against identified supporters, may thereafter feel reluctant to participate in union activities." Id.; see also NLRB v. Grand Canyon Mining Co., 116 F.3d 1039, 1045 (4th Cir. 1997) ("[A]n employer violates section 8(a)(1) of the Act if it gives employees the impression that it is conducting surveillance of their union activities."); J.P. Stevens & Co., 638 F.2d at 683 ("It is an unfair labor practice for an employer to create in the minds of employees an impression that he is closely observing union organizational activity."). Such excessive or coercive "surveillance becomes illegal because it indicates an employer's opposition to unionization, and the furtive nature of the snooping tends to demonstrate spectacularly the state of the employer's anxiety." Belcher Towing, 726 F.2d at 708 n.2. "From this the law reasons that when the employer either engages in surveillance or takes steps leading his employees to think it is going on, they are under the threat of economic coercion." Id.

Ultimately, "[t]he test for determining whether an employer engages in unlawful surveillance, or unlawfully creates the impression of surveillance, is an objective one and involves the determination of whether the employer's conduct, under the

21

[totality of the] circumstances, was such as would tend to interfere with, restrain, or coerce employees in the exercise of their rights guaranteed under Section 7 of the Act." Southern Md., 916 F.2d at 938 (internal quotation marks omitted); cf. Nueva Eng'g., 761 F.2d at 965 (The employer's conduct must have a "reasonable tendency in the totality of the circumstances to intimidate" the employees.).

For example, we consider "the duration of the observation, the employer's distance from its employees while observing them, and whether the employer engaged in other coercive behavior during its observation." Aladdin Gaming, LLC, 345 N.L.R.B. 585, 586 (2005). But we must also consider whether the employer had a legitimate reason for observing the activities or for otherwise being present at the place where the alleged surveillance has occurred. See, e.g., Nueva Eng'g., 761 F.2d at 967 (upholding violation where two supervisors went to an off-site location "for the purpose of surveilling a scheduled union meeting" and, "when no meeting occurred, the supervisors followed three employees to an employee's home"); Sprain Brook Manor Nursing Home, LLC, 351 N.L.R.B. 1190, 1191 (2007) (finding unlawful surveillance where nursing home administrator went to facility on her day off "solely for the purpose of observing union activity" and stood in the doorway closest to where the union organizer was meeting with the employees so as to be able

22

to see the employees and be seen by them); PartyLite Worldwide, Inc., 344 N.L.R.B. 1342, 1342 (2005) (finding unlawful surveillance of union handbilling activities because, "on three separate occasions shortly before the election, no less than eight high-ranking managers and supervisors stood at entrances to the employee parking lot watching the [union] give literature to employees as they entered and exited the parking lot during shift changes," "the presence of managers and supervisors at the entrances to the parking lot was surprising and an unusual occurrence," and "[t]he employer established no legitimate explanation for why any of its managers and supervisors were stationed in the parking lot during the [Union's] handbilling activities"); S.J.P.R., Inc., 306 N.L.R.B. 172, 172 (1992) (finding that the employer "engaged in unlawful surveillance by posting one or two security guards near the employee entrance and another security guard with binoculars in an upstairs hotel room in order to observe employees and union agents soliciting union authorization card signatures across the street from the hotel," because it "constituted more than ordinary or casual observation of public union activity" and "[t]here [was] no evidence that the [employer's] conduct was based on safety or property concerns"); Eddyleon Chocolate Co., 301 N.L.R.B. 887, 888 (1991) (finding violation where supervisor "drove his car to within 15 feet of" the union representative, "watched employees

as [the union representative] handed them literature . . . near the entrance to the [employer's] parking lot," and "spoke into his car telephone" until the union representative left); <u>Arrow Auto. Indus.</u>, 258 N.L.R.B. 860, 860-61 (1981) (finding unlawful surveillance of union handbilling activities where "[s]oon after the handbilling began on 2 of the 3 days . . . in question, 11 of the [employer's] supervisors lined up in varying numbers near each of the three gates, observing the employees as they drove past the union handbillers," "the presence of the supervisors was highly unusual," "the supervisors' presence was deliberately calculated to show and demonstrate observation in numbers and force," and the employer failed to demonstrate a legitimate reason for being there) (internal quotation marks, alterations, and footnotes omitted).

3.

This case presents an additional and somewhat unusual circumstance for consideration as well because, unlike in the more typical unlawful-surveillance situation, Intertape's legitimate explanation for being at the gate was to exercise its First Amendment and Section 8(c) right to leaflet its employees during a union campaign in a nonthreatening manner. There was no union activity to observe when they began this protected speech. And when the union supporters joined them in this

24

protected activity, the supervisors and the union supporters engaged in simultaneous but noncoercive speech.

As noted earlier, Section 8(c) of the Act limits the prohibition set forth in § 8(a)(1). See J.P. Stevens, 638 F.2d at 684. "Counterbalancing the [Section 8(a)] prohibition against" an employer interfering with, restraining, or coercing employees who are engaged in protected Section 7 activities "is [the] employer's strong interest in preserving its right to free speech," which "Congress expressly recognized . . . by enacting" Section 8(c) of the Act. American Pine Lodge Nursing & Rehab. Ctr. v. NLRB, 164 F.3d 867, 875 (4th Cir. 1999).

Specifically, Section 8(c) "protects speech by both unions and employers," Chamber of Commerce v. Brown, 554 U.S. 60, 67 (2008), by providing that such speech "shall not constitute or be evidence of an unfair labor practice under any of the provisions of the Act," so long as "such expression contains no threat of reprisal or force or promise of benefit," 29 U.S.C. § 158(c) (emphasis added). Section 8(c) "manifest[s] a 'congressional intent to encourage free debate on issues dividing labor and management.'" Chamber of Commerce, 554 U.S. at 67; see also NLRB v. Gissel Packing Co., 395 U.S. 575, 617 (1969). "[P]ermitting the fullest freedom of expression by each party nurtures a healthy and stable bargaining process."

American Pine, 164 F.3d at 875 (internal quotation marks omitted).

Given the competing but protected interests at play, therefore, a "balance [must] be struck between an employer's free speech rights as protected by subsection 8(c) and employees' rights to associate freely as embodied in section 7, subsection 8(a)(1), and the proviso to subsection 8(c)." Procter & Gamble Mfg. Co. v. NLRB, 658 F.2d 968, 983 (4th Cir. 1981); see also Gissel Packing, 395 U.S. at 617. The protection is not "a cloak to hide obviously intimidating conduct," NLRB v. Williams, 195 F.2d 669, 672 (4th Cir. 1952), but the fact that the employer is engaged in such protected speech is a relevant factor to be considered.

In Arrow-Hart, the Board addressed this interplay between Section 8(a)(1)'s prohibition against coercive or excessive surveillance and Section 8(c)'s protection of an employer's speech. There, the supervisors' leafleting activity inside the glass door of the plant likewise placed them in a position where they could see union supporters who were engaged in the very same protected activity outside the glass door. They were also acting in a manner "out of the ordinary," insofar as they were leafleting their employees near the entrance as part of their campaign against unionization. Nevertheless, the Board found no unfair labor practice because there was no evidence that the

26

supervisors were engaged in <u>coercive</u> surveillance during this counter-leafleting activity.  As the Board correctly recognized,

> An employer has the right to distribute election campaign material of its own.  It has a right to express its opinion of union literature, even calling it trash – in writing as well as orally.  And, it has a right to do these things at the very moment the union is trying to persuade the employees to a contrary view – certainly anywhere on its premises, in the inner reaches of the plant or at the front door, even if the door is made of looking-through glass. What the General Counsel's argument really amounts to here is that the Respondent may not do what it legally is permitted to do.

203 N.L.R.B. at 406; <u>see</u> <u>also</u> <u>Aladdin Gaming</u>, 345 N.L.R.B. at 585-86 (finding no violation where supervisors interrupted union supporters who were soliciting employees in the employer's cafeteria to give "management's perspective on unionization" as it had a right to do under Section 8(c)).

4.

Here, in contrast, the Board found unlawful surveillance by the Intertape supervisors merely because the supervisors' leafleting was "out-of-the-ordinary" -- insofar as they had never done it prior to the union campaign -- and because the supervisors could "see" the employees when the union supporters were simultaneously leafleting.  J.A. 679.  Moreover, the Board declined to give any countervailing consideration to the fact that Intertape was engaged in protected Section 8(c) activity at the time, or to the fact that Intertape was engaged in this

27

activity well before the union supporters arrived to counter-leaflet. This was error.

Plainly, to transform Intertape's protected Section 8(c) activity into the unlawfully coercive surveillance prohibited by Section 8(a)(1), the Act requires more than mere "out-of-the-ordinary" conduct in an area where employees can be seen; the Act requires conduct that could have reasonably been construed in the totality of the circumstances as coercive, intimidating, or threatening in nature. As our sister circuit has observed, "[i]n recent cases involving employer surveillance of union activities, the Board has seemed to ignore this critical coercion element." Greater Omaha Packing Co. v. NLRB, 790 F.3d 816, 823 (8th Cir. 2015). The same holds true here.

First, the supervisors' ability to observe employees as they interacted with union supporters on company property during the brief periods of simultaneous leafleting is insufficient to render the supervisors' leafleting coercive, intimidating, or threatening in nature. See Southern Md., 916 F.2d at 938; Belcher Towing, 726 F.2d at 709. There is no evidence that Intertape's supervisors engaged in "excessive surveillance" of the union supporters' leafleting activity during the periods of simultaneous leafleting or, for that matter, that they were "watching" them at all. Nor is there any indication that they

continued to leaflet on the two afternoons in question in order to spy on or snoop into the employees' union activities.

Second, the Board placed too much significance upon the fact that Intertape had never leafleted its employees at the plant gate prior to the union campaign. Although an employer's act of observing employees in a way that is "out of the ordinary" can provide evidence that incidental observation, in the totality of the circumstances, should instead be construed as coercive or intimidating surveillance or spying, not every "out of the ordinary" activity by an employer can be deemed, a fortiori, coercive or threatening in nature. See, e.g., Southern Md., 916 F.2d at 939 ("It is firmly established that management officials may observe public union activity, particularly where such activity occurs on company premises, without violating § 8(a)(1) of the Act, unless such officials do something 'out of the ordinary.'"); Aladdin Gaming, 345 N.L.R.B. at 585-86 (while a "supervisor's routine observation of employees engaged in open Section 7 activity on company property does not constitute unlawful surveillance," the exception arises when "an employer . . . surveils employees engaged in Section 7 activity by observing them in a way that is 'out of the ordinary' and thereby coercive"). On the contrary, the cases have always considered the employer's reason for being in a particular place at a particular time, even if it is unusual or

29

out of the ordinary, and the Act's requirement that there be indicia of coercion or intimidation requires no less. See Arrow-Hart, 203 N.L.R.B. at 406 ("If, as they approached the front door to reach some of the employees, the supervisors also . . . saw their counterparts giving out their election material, it was something that could hardly be avoided in any event. It would be childish to call this spying, for if there is one thing everybody knew all the time it is that the [union] was distributing outside and the Company inside.").

Here, Intertape was arguably not engaged in "out-of-the-ordinary" behavior at all, because by the time the union supporters arrived to counter-leaflet alongside them, the supervisors had already leafleted at the gate on one occasion and were into their second session. The fact that they had never leafleted employees prior to the union campaign also adds nothing to the coerciveness inquiry. The union campaign itself was "out of the ordinary," in that the Union was attempting to unionize Intertape's workforce. That Intertape responded to this out-of-the-ordinary event by engaging in leafleting for the first time does not make its actions suspect. Rather, in light of the union campaign, the employer's decision to present its views through its own gate-side leafleting seems entirely ordinary.

30

Nevertheless, even if we were to consider the supervisors' presence at the gate to be "out of the ordinary," it is not the type of "out-of-the-ordinary" observation or conduct that the Board or the courts have reasonably viewed as being coercive or intimidating in nature.  Nor would the language of the Act allow for such an over-inclusive definition.

As in Arrow-Hart, "[w]hat the General Counsel's argument really amounts to here is that the [employer] may not do what it legally is permitted to do" under Section 8(c).  Id.  Indeed, by accepting this argument, the Board is effectively requiring employers to cease engaging in protected conduct whenever union supporters choose to engage in identical, protected conduct alongside them.  The Act, however, explicitly protects the employer's right to express its viewpoint in this manner, and that right cannot be extinguished absent a "threat of reprisal or force or promise of benefit," 29 U.S.C. § 158(c), which is nonexistent here.  Similarly, Intertape's mere act of simultaneous leafleting, even if such leafleting is construed as "out of the ordinary," is plainly insufficient to establish the intimidation or coercion required under Section 8(a)(1).

Here, the Intertape supervisors did not go to a place where union supporters or other employees were engaged in union activities for the purpose of "spying upon" them, either from afar or up close.  They went to a gate on company property,

31

where there were no union supporters and no employees engaged in union activity, in order to exercise their First Amendment and statutorily protected right to communicate their views about the upcoming election to their employees. During the two short periods of simultaneous leafleting, the Intertape supervisors did not speak to the employees or the union leafleters, beyond exchanging pleasantries. There is no evidence that they stared or glared at the employees or the leafleters. There is no evidence that they attempted to force their leaflets upon the employees, or that they attempted to persuade employees or signal to them that they should not accept the union leaflet in addition to or in lieu of the employer's leaflet. They did not take photographs or otherwise record what was transpiring during the brief periods of simultaneous leafleting. And there is no evidence that they otherwise engaged in behavior that could reasonably have been construed as coercive, intimidating, or threatening.

Under the totality of the circumstances -- which includes the absence of any threatening expression that could have extinguished Intertape's Section 8(c) right to leaflet at the gate -- Intertape's legitimate reason to be there did not vanish when the union supporters arrived to counter-leaflet, nor were the Intertape supervisors required to retreat when the union supporters did arrive. The Intertape supervisors were required

32

to conduct their leafleting activity in a noncoercive and nonthreatening manner, and there is no indication that they did not do so.

For the foregoing reasons, we hold that substantial evidence does not support the Board's conclusion that Intertape engaged in unlawful surveillance when it leafleted at the gate on the afternoon of April 24, when the Union supporters chose to leaflet alongside them, or on the afternoon of April 25, when Intertape chose to continue its leafleting activities in advance of the election. Accordingly, we decline to enforce this portion of the Board's order.

IV.

To conclude, we grant Intertape's petition for review in part and deny it in part, and we grant the Board's cross-petition for enforcement in part and deny it in part. Specifically, we enforce that portion of the Board's order concluding that Intertape engaged in unlawful interrogation of an employee in February of 2012, as well as that portion of the Board's order concluding that Intertape unlawfully confiscated union flyers in March of 2012. However, we deny enforcement of the Board's order concluding that Intertape engaged in unlawful surveillance of union activity in April of 2012, and remand to the Board so that it can modify its Order in accordance with our decision. Because our decision eliminates one of the two bases

33

upon which the Board set aside the election, see supra at 5 & n.2, the Board will also find it necessary to reconsider its decision to direct a second election.

PETITION FOR REVIEW GRANTED IN PART AND DENIED IN PART; ENFORCEMENT GRANTED IN PART AND DENIED IN PART; REMANDED

34

WILKINSON, Circuit Judge, concurring:

I concur fully in Chief Judge Traxler's fine opinion. I agree with him that substantial evidence did support the Board's interrogation and confiscation findings, but that the part of the Board's order concluding that Intertape engaged in unlawful surveillance of union activity improperly compromised Intertape's right to tell employees its side of the story.

Left to my own devices, I would hold that, even if the unfair labor practices alleged by the General Counsel had occurred, the Board would have exceeded its remedial discretion by ordering a new election. This is all the more so where the Board's most critical finding supporting its direction of a new election has been overturned. Whatever remedial measures may be warranted, a new election is not among them. Intertape's margins in the first election were huge, and its infractions were comparatively minor. The Board's decision to order a new election in these circumstances failed to respect the choice Intertape's employees made.

I acknowledge, however, that circuit precedent does not leave me to my own devices. See, e.g., NLRB v. Low Kit Min. Co., 3 F.3d 720, 729-30 (4th Cir. 1993); Daniel Const. Co. v. NLRB, 341 F.2d 805, 809-10 (4th Cir. 1965). As a result, I join the court's opinion, including the terms of the remand order, which provides simply that the Board will "find it necessary to

reconsider its decision to direct a second election." Maj. Op. at 33. I suggest, however, that the authority of circuit courts to review a Board's do-over election order at this stage of the proceedings warrants additional reflection and reexamination, bearing foremost in mind the need to restore a sense of balance between agencies and courts.

## I.

Agencies do many good and necessary things. Through their efforts, our environment is cleaner, our food safer, our economy steadier, and our labor-management relations smoother. Behind these blessings, however, is a growing bureaucracy, a "vast power [that] touches almost every aspect of daily life." City of Arlington, Tex. v. FCC, 133 S. Ct. 1863, 1878 (2013) (Roberts, C.J., dissenting). This power draws its strength from its frequent combination of the legislative, executive, and judicial functions -- a combination that "heighten[s] the potential for abuses that the traditional system was designed to check." Cass R. Sunstein, Constitutionalism After the New Deal, 101 Harv. L. Rev. 421, 447 (1987); see also The Federalist No. 47 (James Madison) ("The accumulation of all powers . . . in the same hands . . . may justly be pronounced the very definition of tyranny.").

Unfortunately, this potential for abuse meets little resistance from ordinary democratic processes. The difficulty of

passing a bill in both houses and surviving a potential presidential veto "limits [] Congress's ability to impose" its will on the administrative state. Elena Kagan, Presidential Administration, 114 Harv. L. Rev. 2245, 2259 (2001). Presidential control offers no sure hope either, because "no President (or his executive office staff) could . . . supervise so broad a swath of regulatory activity." Id. at 2250; cf. City of Arlington, Tex., 133 S. Ct. at 1878 (Roberts, C.J., dissenting) ("President Truman colorfully described his power over the administrative state by complaining, 'I thought I was the President, but when it comes to these bureaucrats, I can't do a damn thing.'"). Even if the President could fully supervise the executive branch, he would face little pressure from voters to do so, for "the general public is often unaware of political decisions being made at the agency level." Donald S. Dobkin, The Rise of the Administrative State: A Prescription for Lawlessness, 17 Kan. J. L. & Pub. Pol'y 362, 367 (2008).

In the early days of administrative law, organic statutes giving agencies capacious power to effectuate broad policies often complicated judicial review. The National Labor Relations Act (NLRA), for example, frames the Board's remedial authority in broad terms. Section 10(a) "empower[s]" the Board "to prevent any person from engaging in any unfair labor practice." 29 U.S.C. § 160(a). Section 10(c) further "authorizes the Board to

require persons found engaged or engaging in unfair labor practices 'to take such affirmative action . . . as will effectuate the policies of this [subchapter].'" Va. Elec. & Power Co. v. NLRB, 319 U.S. 533, 539 (1943) (quoting 29 U.S.C. § 160(c)).

Fortunately, however, the American people eventually added an important condition to the administrative bargain: the Administrative Procedure Act (APA). "[F]ramed against a background of rapid expansion of the administrative process," the APA was meant to act as "a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." Perez v. Mortg. Bankers Ass'n, 135 S. Ct. 1199, 1211 (2015) (Scalia, J., concurring) (quoting United States v. Morton Salt Co., 338 U.S. 632, 644 (1950)); see also 92 Cong. Rec. 2149 (1946) (statement of Sen. McCarran) (describing the APA as a "bill of rights for the hundreds of thousands of Americans whose affairs are controlled or regulated . . . by agencies of the Federal Government"). The APA thus proscribes administrative action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706.

II.

Before examining the Board's decision to direct a second election in this case, however, I consider the court's power to

38

review that decision. A few years after the passage of the NLRA, the Supreme Court held that the Act "indicates a purpose to limit the review afforded [under the NLRA's judicial-review provisions in Sections 10(e) and 10(f)] to orders of the Board prohibiting unfair labor practices." Am. Fed'n of Labor v. NLRB, 308 U.S. 401, 409 (1940). The Court concluded that, because the Board's decision to direct an election is "but a part of the representation proceeding," that decision is not subject to judicial review under Section 10(f). NLRB v. Int'l Brotherhood of Elec. Workers, 308 U.S. 413, 414 (1940). By withholding jurisdiction from the courts of appeals "until the Board issues an order and requires the employer to do something predicated upon the result of an election," NLRB v. Falk Corp., 308 U.S. 453, 459 (1940), the Court followed legislators' perceived intent: to allow employees to vote on union membership before facing possible judicial interference. Am. Fed'n of Labor, 308 U.S. at 409-11 & n. 2. It subsequently reiterated that Congress intended to avoid "dragging [the case] on through the courts" before giving employee democracy its chance. Boire v. Greyhound Corp., 376 U.S. 473, 477-79 (1964).

Decisions of the courts of appeals, including some in the Fourth Circuit, have expanded this Supreme Court precedent to mean that, even when a first election has already been held, "the Board's direction of a new election is not a final order

39

reviewable under either section 10(e) or section 10(f) of the NLRA." See, e.g., Adtranz ABB Daimler-Benz Transp., N.A., Inc. v. NLRB, 253 F.3d 19, 22, 24-25 (D.C. Cir. 2001) (refusing to consider petitioner's challenge to the Board's second-election order even though the Board's unfair labor practice determinations were "utterly without merit"); Low Kit Min. Co., 3 F.3d at 729-30 (holding a second-election order "not final under the Act and . . . not ripe for judicial review").

According to this view, then, a company may obtain judicial review of a Board's second-election order only by navigating an unusually circuitous course. First, the company must submit to a second election. Next, assuming the union wins that election, the company must refuse to bargain with the union. This refusal will then give the Board the opportunity to find that the company has engaged in an unfair labor practice. And this determination, at long last, will provide the predicate for judicial review of the Board's order. On appeal, the company may defend its refusal to bargain by claiming that the second election was unnecessary. See Heartland Human Servs. v. NLRB, 746 F.3d 802, 805-06 (7th Cir. 2014).

The courts of appeals, however, should have jurisdiction to review a Board's direction of a second election when that direction is but the remedial portion of the Board's final order. I say this for two reasons. The first involves the

earlier Supreme Court decisions. The second involves the text of the NLRA itself.

First, none of the earlier Supreme Court cases dealt with the particular question of an election already conducted and a Board order addressing the conduct of that election and any associated remedies. See Am. Fed'n of Labor, 308 U.S. at 402-03; Int'l Brotherhood of Elec. Workers, 308 U.S. at 414; Falk, 308 U.S. at 459. The legislative concern motivating the Court in these cases -- that jurisdiction over election-related orders would allow courts to interfere with the Board's certification proceedings before employees even have a shot at voting -- applies with significantly less force after a first election has already been held.

Indeed, a recent Fifth Circuit case declined to extend those decisions to the decertification election context. NLRB v. Arkema, 710 F.3d 308, 319 (5th Cir. 2013) (denying "enforcement of the order setting aside the election and requiring a new one"); see also Graham Architectural Prod. Corp. v. NLRB, 697 F.2d 534, 545-46 (3d Cir. 1983) (Garth, J., dissenting) (arguing for judicial review of second-election orders in the certification context). And even in decisions declining to review the Board's second-election order, courts have noted, almost apologetically, that their decision not to do so flies in the face of judicial efficiency. See, e.g., Graham Architectural

Prod. Corp., 697 F.2d at 543 ("[C]onsiderations of efficiency and judicial economy seem to suggest that we review the election order as well.").

Secondly, the text of the NLRA itself plainly does not bar judicial review in these cases. The text provides simply that review lies where a "final order" of the Board has issued in regard to any unfair labor practice. 29 U.S.C. § 160(f). The statute also speaks remedially. We are empowered to rule on any final order granting in whole or in part "the relief sought." Id. Here, a final order of the Board has indeed issued. The Board found that Intertape's pre-election activity involved unfair labor practices under Section 8(a), and based on this determination, the Board ordered a new election. But the remedial components of the Board's order are not something separate and apart from its findings as to liability. Here, the Board's Order notes that "the election held on April 26 and 27, 2012 . . . is set aside," and then proceeds on the very same page recounting the alleged unfair labor practices to direct a second election and set forth the conditions for holding it. J.A. 681; Intertape Polymer Corp., 360 NLRB No. 114, 2014 WL 2192498, at *4 (May 23, 2014). The date of the order and the signatures of those Board members ascribing to it follow right on the heels of the above. J.A. 681. The Board ostensibly "sever[s]" its direction of a new election from the rest of its

42

disposition. J.A. 681. But this boilerplate severance sentence is hollow formalism, and the Board's own Statement of Jurisdiction commendably recognizes as much. It refers to its "Decision, Order, and Direction of Second Election issued May 23, 2014" as a "final order with respect to all parties." Resp. Br. 1-2.

This is one, single final order. Why artificially segment it? Nothing in the text of the NLRA permits us to salami-slice the Board's order, and the most basic factors of efficiency and economy suggest that we review the underlying order -- both the unfair labor practices and the remedial prescriptions -- in its entirety.

This is especially the case where, as here, we have reviewed and found wanting the most critical finding underlying the Board's direction of a new election. With the underpinning of the Board's order thus removed, it is appropriate to deal with the matter in its entirety. I do not think the sparse language of the NLRA forbids judicial review; quite the contrary. By simply referring to a final order as a unitary whole it suggests that review would be permitted. Indeed, the statute plainly empowers courts of appeals to "enter a decree enforcing, modifying and enforcing as so modified, or setting aside in whole or in part the order of the Board." 29 U.S.C. § 160 (e), (f).

43

One overarching point remains. Surrendering judicial review of a Board's do-over election order severs the historically interwoven concepts of violation and remedy. It likewise severs labor law from a foundational principle of administrative law: arbitrary and capricious review under the APA. The arbitrary and capricious standard defines as much as anything the relationship between courts and agencies in our country, and to relinquish or dilute that standard tilts the balance too emphatically in favor of the administrative state and against the check and balance of judicial review. The Board's new election order was a remedial step intended to cure Intertape's violations of the NLRA. But a remedial order constitutes an agency action that is no less (and often more) susceptible to agency caprice than is an agency finding of liability.

"The Supreme Court has always assumed that Congress intended the judicial review provisions of both [the APA and the NLRA] to be equivalent," and it "has read the NLRA as if it included an arbitrary and capricious test." Diamond Walnut Growers, Inc. v. NLRB, 113 F.3d 1259, 1266 (D.C. Cir. 1997) (en banc) (citing Universal Camera v. NLRB, 340 U.S. 474, 487 (1951); Linden Lumber Div., Summer & Co. v. NLRB, 419 U.S. 301, 309-10 (1974)). One need not ascribe independent jurisdictional force to the APA in order to note that the guiding principles of administrative law -- arbitrary and capricious review under the

APA -- should provide the overall perspective from which courts assess their authority. "[I]t is, of course, the most rudimentary rule of statutory construction . . . that courts do not interpret statutes in isolation, but in the context of the corpus juris of which they are a part, including later-enacted statutes." Branch v. Smith, 538 U.S. 254, 281 (2003). The Supreme Court's 1940 cases, which some later courts wrongly extended, were decided without the benefit of the APA. Given that those 1940 decisions are likewise distinguishable from cases involving re-run (not initial) elections, it needlessly eviscerates the purpose of administrative procedure under the APA to extend them further.

Courts must remain mindful of the real jurisdictional limitations on our reviewing role under the NLRA. See, e.g., Low Kit Min. Co., 3 F.3d at 729-30. We have been careful to respect the Board's management of representation proceedings where warranted. See e.g., Perdue Farms, Inc. v. NLRB, 108 F.3d 519, 521 (4th Cir. 1997). Here, however, we consider the impact of the APA on the NLRA jurisdictional provisions in a case where an election has been held and the Board's finding underpinning a second-election order has been overturned. Our duty is to deny enforcement to those remedial directives that are "arbitrary, capricious," or contrary to law, 5 U.S.C. § 706, and that are indistinguishably part of Board final orders concededly ripe for

45

review, 29 U.S.C. § 160(f). I therefore turn to the question of whether the Board's second-election order here was arbitrary and capricious.

## III.

Ordering a new election after the first contest's landslide results, and on account of comparatively minor company violations, overstepped the Board's remedial discretion. First, more carefully tailored remedies could adequately address any illegitimate conduct without forcing a second election unlikely to yield a different result. Second, the Board's order both departs from Board precedent focusing on whether a given error actually affected an election's outcome and relies on a harmless error rule that, when applied as it was here, is far out of proportion to the harm it protects against.

## A.

Intertape's employees voted 142-97 against the union, a margin of 45 votes, or almost 19%. By way of comparison, no presidential candidate has won a more lopsided share of the popular vote since Nixon defeated McGovern in 1972. See Leip, David, United States Presidential Election Results, David Leip's Atlas of U.S. Presidential Elections, www.uselectionatlas.org/RESULTS/ (last visited Aug. 24, 2015). Surely marginal company infractions should not undermine this election result.

Here, we hear only three minor complaints. First, an Intertape supervisor allegedly approached a single employee and asked about his union sentiments. But this "interrogation" occurred before the critical period, and the Board rightly did not rely on it when ordering a new election. J.A. 680. Next, Intertape expedited "the cleanup of a break room that, at most, involved the removal of certain material for several hours on 2 days approximately 1 month before the election." J.A. 682; Intertape Polymer Corp., 360 NLRB No. 114, at *3 (Member Miscimarra, dissenting). Finally, Intertape conducted a leafletting campaign simultaneous with a similar union campaign. The Board found that this parallel leafletting constituted unlawful surveillance of union activity. J.A. 679-80.

This last charge -- that Intertape unlawfully surveilled its employees while leafletting -- is particularly problematic because, as the court notes, it gives short shrift to Intertape's own free speech rights. Intertape's right to express its views on union membership to its employees is protected by the First Amendment. Chamber of Commerce v. Brown, 554 U.S. 60, 67 (2008); see also Allentown Mack Sales & Serv., Inc. v. NLRB, 522 U.S. 359, 386 (1998) (Rehnquist, C.J., concurring and dissenting) ("An employer's free speech right to communicate [its] views to [its] employees is firmly established and cannot be infringed by a union or the Board."). The Board found

47

unlawful surveillance because Intertape supervisors do not typically communicate with employees by leafletting at the plant gate; that they did so was "out of the ordinary." J.A. 679. But elections are themselves "out of the ordinary" -- that Intertape does not resort to leafletting for day-to-day personnel communications cannot be used as a reason to muzzle the exercise of free speech when campaign season arrives.

To hold broadly that simultaneous leafletting involves unfair supervisory surveillance of employees overlooks the fact that elections of all sorts involve simultaneous communication of competing points of view. It also confers upon a union a veto power over employer speech at prime times and on critical days. Chief Judge Traxler has put the point well: "by accepting [the General Counsel's] argument, the Board is effectively requiring employers to cease engaging in protected conduct whenever union supporters choose to engage in identical, protected conduct alongside them." Maj. Op. at 31.

In any event, these alleged infractions could not have forced the hands of 45 adult employees, the large margin by which the union lost. I agree fully with the Board that the employer had no right here to expedite its so-called "clean up" and remove the union materials from the breakroom. But dozens of thinking employees did not vote differently because of a premature cleanup of a breakroom weeks before the election. Nor

48

did the risk of accepting a leaflet within view of a supervisor plausibly scare so many workers from expressing their true beliefs via secret ballot. The NLRA "does not require the Board to treat employees as if they were bacteria on a petri dish that must be kept free of contamination." NLRB v. Lovejoy Indus., Inc., 904 F.2d 397, 402 (7th Cir. 1990). The Board's ultra-sanitized approach gives too little weight to the jockeying inherent in any election and too little credit to employees' capacity for independent thought.

Requiring a new election, moreover, may impose real costs on employer and employee alike. A second election distracts both from their work, may risk damage to joint morale, and absorbs considerable time and resources. And the results of any do-over election would quite possibly be contested and litigated as well. Where does it all end? There are of course instances where the employer will abuse its very position as employer and render elections something other than the product of free choice. There will of course be situations where the result of an election will be fatally compromised by unfair labor practices, but this was not one of those, and the Board's remedial order revealed an insensitivity to the burdens that agency actions can impose upon those companies who possess but limited recourse to check official overreach.

None of this is to say that properly proven infractions should be left uncorrected. But the power to remedy comes with the responsibility to issue an appropriate remedy. The Supreme Court has instructed federal courts, for example, that a "grant of jurisdiction to issue compliance orders hardly suggests an absolute duty to do so under any and all circumstances." Tenn. Valley Auth. v. Hill, 437 U.S. 153, 193 (1978) (quoting Hecht Co. v. Bowles, 321 U.S. 321, 329 (1944)). Accordingly, it has rejected mechanical rules mandating injunctive relief. See, e.g., eBay Inc. v. MercExchange, LLC, 547 U.S. 388, 393-94 (2006) (rejecting the Federal Circuit's general rule requiring a permanent injunction against a patent infringer upon a finding of infringement absent exceptional circumstances). It has instead espoused the commonsense notion that "the nature of the violation determines the scope of the remedy." Swann v. Charlotte-Mecklenburg Bd. of Ed., 402 U.S. 1, 16 (1971). When it has recognized possible liability, the Court has been careful to instruct that "[r]emedial orders . . . should concentrate on the elimination of the offending practice." Tex. Dept. of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc., 135 S. Ct. 2507, 2524 (2015).

If federal courts can leaven their remedial powers with a dose of proportionality, administrative agencies can too. It does not take agency expertise to determine that landslide

election results are not altered by insubstantial infractions. Here, the Board could have pursued a more proportionally tailored remedy by, for example, finding the employer at fault and requiring it both to cease and desist from its unfair labor practices and to post the Board's cease and desist order in "conspicuous places." See, e.g., Flamingo Las Vegas Operating Co., 360 NLRB No. 41, 2014 WL 559058, at *6-7 (Feb. 12, 2014) (finding a cease and desist order to be an adequate remedy and declining to order a new election). Here, such an order would draw attention to the misconduct without the unnecessary dislocations of another election.

## B.

The Board's direction of a new election was also inconsistent with its own past practice. Previous Board decisions have inquired more thoroughly into whether any misconduct actually affected the election's outcome. Some do follow the stringent harmless error rule of Super Thrift Markets, Inc., which requires a new election unless it is "virtually impossible to conclude that [misconduct] could have affected the results." 233 NLRB 409, 409 (1977). See, e.g., Long Drug Stores Cal., Inc., 347 NLRB No. 45, 2006 WL 1810612, at *5 (Jan. 28, 2006) (holding it "virtually impossible" for isolated misconduct to have affected a "wide margin" of votes).

Other cases, however, apply a more searching multi-factor inquiry, considering among other things the "proximity of the misconduct to the election" and the "closeness of the final vote." Fjc Sec. Servs., Inc., 360 NLRB No. 6, 2013 WL 5703601, at *9 (Oct. 18, 2013) (citing Taylor Wharton Div., 336 NLRB 157, 158 (2001)). No matter which standard it invokes, however, in many of its past cases the Board has determined that it will not order a new election where misconduct does not materially affect election results. In Clark Equipment Co., for example, the Board found that an employer's misconduct could not have "affected the results of the election," because with a tally of 391 for, and 489 against the union (a result less lopsided in percentage terms than that in this case) the election "[could not] be characterized as close." 278 NLRB 498, 505 (1986).

The Board did not invoke any particular standard when it ordered a new election here, asserting only that the infractions at issue "cannot be trivialized as isolated or de minimis." J.A. 680. This terse analysis, however, resembles a strict application of the "virtually impossible" standard –– one that departs from past cases' more realistic examination of whether any misconduct had a likely effect on election results.

A stringent "virtually impossible" standard could well be the most exacting harmless error rule in all of American law. Compare the Board's rule with some other well-known rules. A

52

person may go to prison for life, for example, after a violation of his federal rights so long as a court can say "with fair assurance" that "the judgment was not substantially swayed by the error." Kotteakos v. United States, 328 U.S. 750, 765 (1946). An individual may receive that same sentence even after a violation of his constitutional rights so long as a court is "able to declare a belief that [the violation] was harmless beyond a reasonable doubt." Chapman v. California, 386 U.S. 18, 24 (1967). That the Board's intolerance of marginal NLRA infractions is greater than that of courts for error in criminal trials is unsettling.

Ordering a new election is likely to be arbitrary and capricious whenever the underlying infraction did not materially affect the first election's results. What could be more capricious, after all, than an order to redo a costly process without good reason to believe that the result will be any different the second time around? This commonsense notion may explain why many courts, including this one, have often referred to a standard of materiality when overruling objections to Board-certified elections. See, e.g., NLRB v. Herbert Halperin Distrib. Corp., 826 F.2d 287, 290 (4th Cir. 1987) (holding that an employer seeking to set aside an election bears the "heavy burden" of showing that infractions "materially affected the election results"); Bridgeport Fittings, Inc. v. NLRB, 877 F.2d

180, 188 (2d Cir. 1989) (holding that "the Board did not abuse its discretion in failing to set aside [the union's victory in an] election" because "the failure . . . did not affect the outcome of the election"). It is unclear why the Board should not also use a standard of materiality and certify an election which was fundamentally fair, even if not impeccably perfect. This is a neutral standard; neither an employer's nor a union's marginal infractions under the NLRA should be grounds for overturning an election if the election proceedings in their totality were fair.

IV.

The Board is "vested with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." NLRB v. Ky. Tenn. Clay Co., 295 F.3d 436, 441 (4th Cir. 2002). But courts must not "rubber stamp" Board decisions -- they can and must step in when the Board goes "beyond what good sense permits." Comcast Cablevision-Taylor v. NLRB, 232 F.3d 490, 495 (6th Cir. 2000). In this case, the Board's action ran counter to a prime objective of our labor law -- that of supporting employee democracy. The Board's decision to order a new election on the basis of minor violations at worst, and under a shifting and unreasonably stringent harmless error rule, failed to honor the fact that the employees in this company made

54

a clear choice as to union representation. One would have thought the verdict of these workers might have been respected.

I end where I began. I join the court's opinion. The precedent of our circuit does not allow a Board re-run election order to be judicially reviewed at this juncture. It is, of course, much to be hoped that the Chief Judge's conscientious review of the Board's underlying unfair-labor-practice findings will cause the Board to withdraw its election re-run order on its own, but, in the absence of a court direction, that is by no means assured. Still, the workers' vote should matter; the employer should not have to undergo an election do-over; the court should not have to await some speculative alleged refusal to bargain under Section 8(a)(5), having in the interim engaged in but piecemeal review and performed what in essence would be a pointless exercise.

What we have before us is a snapshot of an area in which the balance between courts and agencies is simply out of whack. None of this means the Board's role in labor relations is to be devalued or its findings paid less deference, for indeed, its interrogation and confiscation findings in this very appeal were and should have been upheld. But administrative overreach was also on display here. If not in this case, then in some other, Supreme Court evaluation of the timing and extent of court of appeals review of Board second-election orders might be a

55

helpful thing. Helpful, I think, if the benefits and burdens of the administrative state are finally to be reconciled.